ROBERT C. KING, Plaintiff-Appellant, v. PAUL LEVIN, Defendant-Appellee.

First District (1st Division)   No. 1—87—3756

Opinion filed June 5, 1989.

Holleb & Coff, of Chicago (Michael A. Reiter and Lori A. Goldstein, of counsel), for appellant.

Letvin & Stein, of Chicago (David J. Letvin and David M. Stein, of counsel), for appellee.

JUSTICE BUCKLEY delivered the opinion of the court:

Robert King (plaintiff), who is engaged in the business of subsidized real estate development, learned of a Housing and Urban Development (HUD) funding opportunity for low and moderate income housing developments. In pursuit of this opportunity, plaintiff executed an option to purchase two buildings containing 54 units located at 2630-44 North Spaulding and 2219-23 North Kedzie Boulevard in Chicago (hereinafter the Lorington). In September 1983, HUD awarded plaintiff the subsidies for the development, and plaintiff thereafter submitted loan applications for the project to the Illinois Housing Development Authority (IHDA) and the Chicago Metropolitan Housing Development Corporation. In May 1984, IHDA included the Lorington in an upcoming bond sale, through which it would finance the development. On May 21, 1984, four days before the scheduled bond sale, Paul Levin (defendant), a resident of the neighborhood, telephoned IHDA and threatened to institute litigation to stop the project. IHDA subsequently decided to exclude the Lorington from the bond sale.

Plaintiff then filed an action in the circuit court against defendant for tortious interference with prospective economic advantage, alleging that as a result of defendant's malicious threat of baseless litigation to IHDA, he incurred damages from the loss of IHDA's financing. After five days of trial before a jury, the trial judge granted defendant's motion for a directed verdict at the close of plaintiff's case in chief because plaintiff failed to establish that defendant's actions were not privileged under the first amendment right to petition government for redress of grievances, as defendant had alleged in his affirmative defense.

Plaintiff appeals from the trial court's order, contending that the trial court, in directing the verdict against him on first amendment grounds, committed several reversible procedural errors, as well as erroneously concluding plaintiff had not met his burden on the merits. Plaintiff also raises as error the trial court's exclusion of evidence on the issue of damages. We affirm on the ground that plaintiff did not meet his burden of proving the absence of a first amendment privilege.

The first amendment right to petition government for redress of grievances has been invoked as a qualified privilege in the Federal courts and in Illinois to protect persons engaged in activities designed to influence government action from civil liability. *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.* (1961), 365 U.S. 127, 5 L. Ed. 2d 464, 81 S. Ct. 523, established the "Noerr-Pennington doctrine," in invoking this first amendment right to protect efforts to lobby or influence public officials from antitrust liability. The Supreme Court qualified the privilege, however, by excluding from protection lobbying activities constituting a "mere sham"—"nothing more than an attempt to interfere directly with the business relationships of a competitor." *Eastern R.R.*, 365 U.S. at 144, 5 L. Ed. 2d at 475, 81 S. Ct. at 533.

The Supreme Court further expanded the doctrine to protect efforts to seek redress through the judicial process in *California Motor Transport Co. v. Trucking Unlimited* (1972), 404 U.S. 508, 30 L. Ed. 2d 642, 92 S. Ct. 609. The Court recognized there that the right to petition includes the institution of administrative and adjudicatory proceedings. It also applied *Eastern R.R.*'s "sham" lobbying activities exception to "sham litigation," situations involving a pattern of baseless, repetitive claims. Thereafter, a number of lower Federal courts held in antitrust actions that a single lawsuit or claim may constitute "sham litigation." See, *e.g., MCI Communications Corp. v. American Telephone & Telegraph Co.* (7th Cir. 1983), 708 F.2d 1081; *Clipper Ex-*

*press v. Rocky Mountain Motor Tariff Bureau, Inc.* (9th Cir. 1982), 690 F.2d 1240.

Federal and State courts did not limit application of the Noerr-Pennington doctrine and its "sham litigation" exception to antitrust actions, but adopted the doctrine for civil claims outside the antitrust area. See, *e.g., Protect Our Mountain Environment, Inc. v. District Court* (Colo. 1984), 677 P.2d 1361; *Sierra Club v. Butz* (N.D. Cal. 1972), 349 F. Supp. 934; *Landmarks Holding Corp. v. Bermant* (2d Cir. 1981), 664 F.2d 891.

The Illinois Supreme Court invoked the first amendment right to petition government for redress of grievances in a tortious interference with contract action, but applied a different "exception" than that which the Federal courts have adopted. In *Arlington Heights National Bank v. Arlington Heights Federal Savings & Loan Association* (1967), 37 Ill. 2d 546, 229 N.E.2d 514, the court addressed the extent to which acts petitioning a legislative body were privileged under the petitioning clause. It found that the right to petition is not absolute and that wrongful conduct by a person who has "actual malice" is outside the ambit of the privilege. *Arlington Heights*, 37 Ill. 2d at 551, 229 N.E.2d at 518.

With this constitutional foundation, we address plaintiff's claims, beginning with his procedural contentions. Plaintiff initially contends that the trial court improperly shifted defendant's burden of proving his affirmative defense of a qualified privilege to plaintiff by prematurely granting a directed verdict. He argues that by directing the verdict at the close of plaintiff's case in chief, the court improperly required plaintiff to prove "actual malice" or "sham" as an element of his case in chief once the petition privilege became an issue. Notwithstanding our concurrence with defendant's argument that plaintiff has waived this issue by failing to raise it at trial or in post-trial motions and by his arguments before the trial court, we believe plaintiff's contention is without merit.

Aside from citing cases which set forth general principles as to the order of proof relating to affirmative defenses (*Capitol Plumbing & Heating Supply, Inc. v. Van's Plumbing & Heating* (1978), 58 Ill. App. 3d 173, 373 N.E.2d 1089; *Harwood v. Attella* (1963), 44 Ill. App. 2d 280, 194 N.E.2d 520 (abstract of opinion)), plaintiff relies solely on a Federal district court case analyzing Illinois law to support his position that the plaintiff does not have the burden of proving this qualified privilege as an element of his cause of action. In *Haupt v. International Harvester Co.* (N.D. Ill. 1984), 582 F. Supp. 545, 550, the court stated that "Illinois courts consider privilege a defense to tor-

tious interference, and not an element whose absence must be pleaded (or, more importantly, proved) by plaintiff."

In our judgment, *Haupt* incorrectly states Illinois law. The district court in *Haupt* cited a single Illinois Appellate Court case from the fifth district for its assertion. The primary issue in that case, *Kemper v. Worcester* (1982), 106 Ill. App. 3d 121, 435 N.E.2d 827, was whether the plaintiff's position with the bank constituted a sufficient relationship upon which to base an action for tortious interference with contractual relations. The defendants, individual directors of a bank, further argued that they were privileged to urge the entire board of directors to dismiss the plaintiff, an officer of the bank. The *Kemper* court's cursory response that defendant would have the burden of establishing a privilege as a defense was not supported by any Illinois case law.

■ Illinois law is to the contrary. Illinois courts have consistently held in tortious interference actions involving conditional privileges that the plaintiff bears the affirmative burden of pleading and proving the absence of the privilege. In affirming the circuit court's granting of a motion to dismiss, the Illinois Supreme Court in *Arlington Heights* stated that the plaintiff must show "actual malice" on the part of the defendant in order to sustain a cause of action for interference with contract where the alleged wrongful conduct is conditionally privileged. (*Arlington Heights*, 37 Ill. 2d 546, 229 N.E.2d 514.) Similarly, in *Swager v. Couri* (1979), 77 Ill. 2d 173, 395 N.E.2d 921, the Illinois Supreme Court held in a tortious interference action that the absence of a privilege of a corporate officer to act for the corporation must be pleaded and proven in the plaintiff's case in chief.

Illinois appellate courts are in harmony with supreme court precedent. In *American Pet Motels, Inc. v. Chicago Veterinary Medical Association* (1982), 106 Ill. App. 3d 626, 435 N.E.2d 1297, the court affirmed summary judgment against plaintiffs for defamation and tortious interference with prospective business advantage because the plaintiff did not meet its burden of pleading and proving "actual malice" under the privilege of a veterinary member to report the unauthorized practice of medicine. In an opinion that this court filed after hearing oral arguments in the case at bar, we found, in a tortious interference with economic advantage action, that once a qualified privilege is shown to exist, plaintiff has the burden to overcome the privilege by alleging facts from which "actual malice" may be inferred. *Genelco, Inc. v. Bowers* (1989), 181 Ill. App. 3d 1.

■ We reject plaintiff's argument that the above cases are distin-

guishable from the instant case because they involve complaints clearly placing the privilege in issue either because the person was in a privileged *position* as a matter of law or because the privilege was necessarily implicated by the nature of the conduct alleged in the complaint. These Illinois cases do not articulate any distinction between privileges. Moreover, the conduct alleged in *Arlington Heights* no more implicates the first amendment privilege than the conduct alleged in the case at bar. The conduct alleged in plaintiff's complaint here—telephoning a government body to oppose a neighborhood development and informing the government body of intentions to bring litigation to stop a neighborhood development[1]—implicates the very heart of first amendment activity.[2] Thus, we conclude that the trial court properly followed Illinois case law in placing the burden on plaintiff to establish "actual malice" or "sham" as an element of his tortious interference action.

■ Next, plaintiff next argues that this court must reverse the trial court because it failed to specify the standard it applied in granting the directed verdict. At trial, the parties disputed whether the Illinois *Pedrick* standard for directed verdicts (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504) or the *Anderson* clear-and-convincing-evidence standard, which the United States Supreme Court adopted in libel actions (*Anderson v. Liberty Lobby, Inc.* (1986), 477 U.S. 242, 91 L. Ed. 2d 202, 106 S. Ct. 2505), should apply to the issue of "actual malice" or "sham" on the directed verdict motion. Contrary to plaintiff's contention, the transcript indicates that the court articulated its selection of a standard in rejecting the more stringent *Anderson* standard and thereby applying the *Pedrick* standard. Because the court applied the less stringent *Pedrick* standard in evaluating plaintiff's evidence and because we find that plaintiff did not meet its burden under this standard, it is unnecessary for us to determine whether Illinois is required to or should follow the *Anderson* standard.

■ The final procedural issue for our review is whether the "actual malice" or "sham" determination is a question of fact for the

---

[1]Plaintiff's complaint alleged that defendant, who opposed subsidized housing, "telephoned IHDA and threatened IHDA and [plaintiff] with litigation as a result of plaintiff's development."

[2]Unlike the complaint in *Central Telecommunications, Inc. v. TCI Cablevision, Inc.* (W.D. Mo. 1985), 610 F. Supp. 891, wherein the court found that threats of fraudulent conduct and threats "to ruin the career" of a city employee could not be characterized as "lobbying" in the first instance, in the case at bar, defendant's threat was to engage in "petitioning" activity itself.

jury or one of law for the court to decide. Plaintiff's related contention is that the court denied him his right to a jury trial in entering the directed verdict because factual questions existed on this issue which the jury should have determined. Defendant argues that this question is one of law for the court to decide.

We agree with plaintiff that the question is one of fact. Trial courts dealing with "actual malice" or "sham" in the first amendment area have so treated the issue. (*Haupt*, 582 F. Supp. 545; *Central Telecommunications, Inc. v. TCI Cablevision, Inc.* (W.D. Mo. 1985), 610 F. Supp. 891; *Resudek v. Sberna* (1985), 132 Ill. App. 3d 783, 477 N.E.2d 789.) Defendant misplaces his reliance on *Bose Corp. v. Consumers Union of United States, Inc.* (1984), 466 U.S. 485, 80 L. Ed. 2d 502, 104 S. Ct. 1949, and *Time, Inc. v. Pape* (1971), 401 U.S. 279, 28 L. Ed. 2d 45, 91 S. Ct. 633, to support his position that the question is one of "ultimate fact" or a "constitutional rule" for the trial judge. *Bose* and *Time* address appellate review of findings of fact that are deemed to have constitutional significance. These cases hold that reviewing courts should conduct an independent review of the record, recognizing the need to ensure that decisions by triers of fact do not inhibit the expression of protected ideas. (See *Bose*, 466 U.S. at 505, 80 L. Ed. 2d at 519, 104 S. Ct. at 1962.) They do not stand for the proposition that the question of "actual malice" is not one of fact for the jury.

Nonetheless, because the "actual malice" or "sham" question may be one of fact for the jury does not preclude a trial court from entering a directed verdict as to that question. "[T]he right to a jury trial includes the right to a jury verdict only if there are factual disputes of some substance," even where there is "the presence of some slight evidence to the contrary." (*Pedrick*, 37 Ill. 2d at 505, 229 N.E.2d at 513-14.) With this in mind, we turn to the evidence presented by plaintiff at trial to establish the absence of a first amendment privilege and his contention on appeal that the evidence was sufficient to withstand a directed verdict.

The tests applied by the courts to resolve this first amendment issue have been outlined above. The trial court here appears to have applied the "actual malice" test as articulated by the Illinois Supreme Court in *Arlington Heights*. On appeal, while plaintiff argues that the *Arlington Heights* "actual malice" test is inapplicable here because it involves petitioning a legislative body and not threatening baseless litigation as in the instant case, both parties have analyzed the issue applying the "actual malice" and the "sham" tests. Defendant, though, has set forth the "mere sham" petitioning test as articulated in *East-*

*ern R.R.* (365 U.S. 127, 5 L. Ed. 2d 464, 81 S. Ct. 523), while plaintiff, the "sham litigation" test as articulated in *California Motor* (404 U.S. 508, 30 L. Ed. 2d 642, 92 S. Ct. 609) and cases involving the bringing of administrative and adjudicatory proceedings. We hold that plaintiff has failed to present sufficient evidence to *prima facie* defeat defendant's qualified privilege under any of these tests.

In applying the *Pedrick* standard to evaluate whether plaintiff produced sufficient evidence showing defendant's actions were unprotected conduct under the above tests, we are mindful that defendant must demonstrate that all the evidence, when viewed in aspects most favorable to plaintiff, so overwhelmingly favors defendant that no contrary verdict based on that evidence could ever stand. (*Pedrick*, 37 Ill. 2d 494, 229 N.E.2d 504.) Plaintiff insists that the evidence introduced at trial survived *Pedrick* scrutiny, pointing out that a trial court may not substitute its judgment for that of the jury as to the weight of the evidence or the credibility of the witnesses, but must draw all inferences in favor of plaintiff and deny the motion where any evidence or reasonable inferences therefrom support plaintiff's claim. *Roedl v. Lane* (1976), 41 Ill. App. 3d 1062, 355 N.E.2d 354; *Tarzian v. West Bend Mutual Fire Insurance Co.* (1966), 74 Ill. App. 2d 314, 221 N.E.2d 293; *Johnson v. Sleaford* (1963), 39 Ill. App. 2d 228, 188 N.E.2d 230.

The following pertinent evidence was adduced at trial. Defendant, testifying as an adverse witness, stated that he was opposed to the Lorington project because it was his belief 100% subsidized housing was ill-advised in the Logan Square neighborhood, a belief which he had held prior to 1983. He knew of IHDA's plan to sell municipal bonds to finance the Lorington prior to February 1984. In an attempt to gather information, defendant telephoned John Ward, an attorney at the law firm of Chapman and Cutler in Chicago, in February or March 1984 to obtain information concerning the workings of the bonding process. He also telephoned Robert Flando at HUD to obtain information from HUD's perspective.

Defendant expressed his opposition to numerous government officials. In mid-March, defendant and other citizens opposing the project met with the then city housing director, Brenda Gaines, and expressed their concerns. Defendant prepared notes in anticipation of this meeting, which state, "But Mr. King can't be stopped—his deal is all in place." This statement, defendant explained, was a response to a hypothetical assertion and not an assertion of any understanding on his part that the Lorington project could not be stopped at that time.

On April 9, 1984, IHDA received a packet of material from

defendant in which he expressed opposition to the financing. Included in the packet was a letter from an urban planner raising issues of overconcentration of subsidized housing in the area and *Gautreaux* compliance.[3] In this letter, the urban planner stated that in his opinion the development would be "contrary to the non-segregation goals of the *Gautreaux* court order."

IHDA published a notice inviting comments concerning the Lorington at a public hearing, scheduled one hour before the bond sale on May 25, 1984. Subsequently, on May 14, 1984, defendant telephoned John Glennon, the general counsel for IHDA at the time. Glennon testified that defendant expressed his opposition to IHDA's financing the Lorington and asked various informational questions. Glennon's notes of that conversation provide that there "might be litigation" "if necessary."

On May 21, 1984, defendant again telephoned Glennon. Defendant mentioned the packet of materials which had been delivered to IHDA in April, but Glennon had not seen the packet up until that time. Defendant threatened litigation, reiterating his objections to the Lorington project. Glennon testified that during their conversation defendant told him that he had no problem with the developer, only with his development. He stated that defendant did not mention any basis for filing suit, but admitted that he did not inquire into a basis. Defendant admitted that he was unaware of matters concerning the condition of the building, the people living there, or the units in the building at the time of this conversation and that he had never spoken to plaintiff personally about the project.

Glennon testified that because insufficient time remained before the sale to redraft documents to disclose to potential investors the existence of threatened litigation or to procure a "no merit" letter from IHDA counsel, IHDA excluded the Lorington from the May 25 bond sale. Glennon further stated that he did not believe any legal basis existed for challenging IHDA's funding of the Lorington, but that IHDA counsel would not issue a "no merit" letter because "there might be merit to the proposed litigation" due to the many theoretical problems which could arise with a project and the fact that IHDA counsel had not seen the complaint. James T. Albrecht, HUD's Regional Director of Housing, also testified that at the time HUD approved the

---

[3]"*Gautreaux* order" was mentioned throughout the trial court proceedings. Although the specifics of the order from this Federal litigation (*Gautreaux v. Landrieu* (N.D. Ill. 1981), 523 F. Supp. 665) were not introduced at trial, the record indicates that the order provided requirement for funding of subsidized housing, including matters relating to nonsegregation and overconcentration.

funding for the development, it believed the Lorington had met *Gautreaux* requirements.

Subsequent to defendant's May 21 conversation with Glennon, Terry Hilliard, an attorney representing defendant, telephoned Glennon and requested background information concerning IHDA's participation in the Lorington project.

Although IHDA did not plan to take action on May 25, it invited public comment concerning the Lorington at the public hearing. At the hearing, defendant and other members of the public voiced their opposition to the Lorington, raising issues of site control, density, economic feasibility, management control plans, and other issues.

This evidence, viewed in aspects most favorable to plaintiff, is insufficient for a trier of fact to find "actual malice" on defendant's part. In elaborating on the "actual malice" test, the supreme court has stated that "[i]ll-will alone is not enough to establish actual malice *** there must be a desire to harm, which is independent of and unrelated to a desire to protect the acting parties' rights and is not reasonably related to the defense of a recognized property or social interest." (*Arlington Heights*, 37 Ill. 2d at 551, 229 N.E.2d at 518.) Plaintiff presented no facts from which a reasonable inference could be drawn that defendant harbored a desire to harm which was independent of and unrelated to the neighborhood interest which he was seeking to protect. In fact, no reasonable inference as to defendant's state of mind at the time he telephoned IHDA on May 21 can be drawn from this evidence.

Plaintiff argues that the evidence demonstrates that defendant knew plaintiff was a real estate developer who relied on funding from the IHDA bond sale; that defendant, when he realized his efforts would be unsuccessful, communicated with numerous public officials to learn details of IHDA's bond financing; and that defendant threatened baseless litigation days before the bond sale to logistically prevent the sale. These inferences, which plaintiff has drawn from the evidence, are not reasonable or founded in factual evidence.

Plaintiff presented no evidence as to defendant's purpose in gathering the information on the bonding process, that defendant learned how to prevent a bond sale with a single telephone call, or that defendant had any knowledge of the potential effect of his May 21 telephone call. The only factual, nonspeculative evidence plaintiff refers to is a note defendant wrote in anticipation of a meeting in March, stating that plaintiff "can't be stopped." One cannot reasonably infer defendant's state of mind on May 21 or his knowledge of the potential effect of his telephone call from this note, especially in

view of evidence that defendant mentioned the possibility of litigation to Glennon a week earlier, in time for IHDA to redraft documents or procure a "no merit" letter before the bond sale, evidence that defendant continued his opposition efforts by sending a packet of material to IHDA after he had gathered information concerning the bond process, and evidence that defendant continued to voice his opposition at a public hearing after he telephoned IHDA on May 21.

Nor has plaintiff presented sufficient evidence from which a jury could find that the Noerr-Pennington sham exception would apply under either the "sham petitioning" test or the "sham litigation" test. Defendant's telephone call threatening litigation to a government agency appears to involve both the "petitioning to a government body" and the "litigation" components of the Noerr-Pennington doctrine.

■■ ■ To establish "sham petitioning" to defeat defendant's first amendment privilege, plaintiff must demonstrate that defendant did not act for the purpose of seeking favorable governmental action, but his actions were merely a ruse to otherwise injure the plaintiff. (*Eastern R.R.*, 365 U.S. 127, 5 L. Ed. 2d 464, 81 S. Ct. 523; *Havoco of America, Limited v. Hollobow* (7th Cir. 1983), 702 F.2d 643.) As stated above, plaintiff did not present sufficient evidence from which the jury could reasonably infer that defendant made the May 21 telephone call, not for the purpose of seeking favorable government action, but knowing his "petitioning" would logistically prevent the Lorington from inclusion in the May 25 bond sale.

Plaintiff had the burden under the "sham litigation" test to demonstrate that the lawsuit, or the threat of lawsuit as applied to the case at bar, lacked any reasonable basis in fact or law and was brought, not to genuinely influence government action, but primarily to harass or to improperly deter another's legitimate activities. (*Protect Our Mountain*, 677 P.2d at 1367; *Clipper Express*, 690 F.2d at 1253.) We have already concluded that the evidence here was insufficient to reasonably infer that defendant's intent in threatening IHDA with litigation was not for the purpose of genuinely influencing government action. Courts, however, have held that this intent may be inferred from a showing that the litigation was baseless and made without regard to merit. *Clipper Express*, 690 F.2d at 1254.

Plaintiff argues that he proved that defendant's statement that he intended to file a lawsuit was falsely made, that no reasonable basis existed to challenge IHDA, and that defendant had not made inquiry into the merits or hired an attorney to represent him. We disagree. First, no evidence was presented that defendant did not

intend to file a lawsuit. Second, the only evidence introduced as to the merits of the threatened lawsuit was the testimony of Albrech that HUD believed the Lorington met *Gautreaux* requirements and the testimony of Glennon that he did not believe defendant had a basis for the suit. Glennon never asked defendant, or defendant's attorney, for the basis of the suit. Glennon himself admitted that there were many problems that could arise from such a project and that its counsel refused to issue a "no merit" letter without having seen the complaint. Finally, plaintiff did not present facts from which a jury could reasonably infer that defendant did not take steps to inquire into whether he had a basis for the suit. Contrarily, the evidence indicated that defendant had been in communication with attorneys before and after his telephone call. Defendant's attorney also telephoned IHDA seeking information after defendant's May 21 telephone call. Defendant himself had gathered information and sent a packet of such materials to IHDA raising *Gautreaux* and overconcentration problems, including a letter from an urban planner expressing these views.

Accordingly, we hold that the trial court did not err in directing the verdict against plaintiff at the close of his case in chief because plaintiff failed to meet his affirmative burden of proving the absence of a first amendment privilege. Our holding renders it unnecessary to inquire into whether plaintiff established the other elements of his tortious interference action or to address the claimed evidentiary errors on the issue of damages. Therefore, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CAMPBELL and QUINLAN, JJ., concur.