[No. B075022. Second Dist., Div. One. Apr. 28, 1994.]

HI-TOP STEEL CORPORATION et al., Plaintiffs and Appellants, v. BERNARD LEHRER et al., Defendants and Respondents.

COUNSEL

Latham & Watkins, Kirk A. Wilkinson and Albert Choi for Plaintiffs and Appellants.

Ezer, Sment & Williamson and Michael J. Ezer for Defendants and Respondents.

OPINION

SPENCER, P. J.—

## INTRODUCTION

Plaintiffs Hi-Top Steel Corporation, doing business as Weiner Steel Corporation, and Hiuka America Corporation appeal from a judgment on the pleadings in favor of defendants Bernard Lehrer, Sam Adlen and Aadlen Bros. Auto Wrecking, Inc.

## STATEMENT OF FACTS[1]

Plaintiff Hiuka America Corporation (Hiuka) exports scrap steel from Southern California. One method of preparing scrap steel for export is shredding. One part of the market for shredded steel is for shredded automobile bodies. Approximately 50,000 tons of automobile bodies are shredded monthly in Southern California; this is done by only 4 companies.

[1]For purposes of review of a judgment on the pleadings, the facts are the allegations of the complaint, which are taken as true. (*Tiffany* v. *Sierra Sands Unified School Dist.* (1980) 103 Cal.App.3d 218, 225 [162 Cal.Rptr. 669].)

Defendant Aadlen Bros. Auto Wrecking, Inc. (Aadlen Bros.), owned by defendant Sam Adlen (Adlen), owns automobile dismantling yards which supply automobile bodies for shredding. From September 1987 through August 1989, Adlen negotiated with Hiuka regarding the possibility of entering into a joint venture to construct an automobile body shredding facility on property Adlen owned in Sun Valley, California. As part of the joint venture, Adlen would open an automobile dismantling yard next to Hiuka's facility in Wilmington, California and would ship the automobile bodies to Sun Valley for shredding. Adlen expected to be able to control 40 percent of the Southern California market for shredded automobile bodies.

Ultimately, Hiuka declined to enter into the joint venture. Instead, in September 1990, it acquired a 51 percent ownership interest in Weiner Steel Corporation (Weiner Steel); Weiner Steel was in the business of preparing scrap steel for export, but it did not shred automobile bodies. Weiner Steel then developed plans to upgrade its facilities. It also entered into a contract with Newell Industries, Inc. (Newell) to purchase the latest in automobile body shredding equipment and sought the necessary government approvals to install and use the automobile body shredder on its property. The automobile body shredding facility planned by Weiner Steel would be superior to those already in use in Southern California, in that the equipment which would be used is more environmentally sound and efficient to operate than that in use at the other facilities.

Beginning in February 1992, Bernard Lehrer (Lehrer), an Aadlen Bros. employee, contacted the City of Pico Rivera on behalf of Adlen and Aadlen Bros. to make false statements about the installation of the automobile body shredding equipment at Weiner Steel. On March 10, 1992, Weiner Steel's precise plan of design for installation of the shredding equipment was approved by the city planning department. Lehrer then mailed a letter to Councilwoman Gloria Molina containing false statements concerning the Weiner Steel facility. He also filed on behalf of Adlen and Aadlen Bros. an appeal of Weiner Steel's precise plan of design for the purposes of delaying the installation of the shredding equipment, causing plaintiffs undue expense and causing them to abandon their intended entry into the automobile body shredding business.

On May 21, 1992, defendants circulated a flyer to residents of Pico Rivera and the surrounding communities. The flyer contained false statements about the automobile body shredding equipment and encouraged the residents to oppose Weiner Steel's precise plan of design. However, on May 27, Pico Rivera's design review board, after considering Lehrer's appeal, unanimously affirmed the approval of the precise plan of design.

In April 1992, Adlen had informed plaintiffs that Lehrer was his employee and would do anything he asked him to do concerning the appeal of Weiner Steel's precise plan of design. In June, Lehrer stated to a Hiuka representative he would withdraw his appeal if plaintiffs would agree not to shred automobile bodies. If plaintiffs would not agree, he would attempt to delay further installation of the automobile body shredding equipment by asking the City of Pico Rivera to require Weiner Steel to provide an environmental impact report. Lehrer also told Julia Nagano, Director of Public Relations of the Port of Los Angeles, that in opposing the installation of the shredding equipment he was representing the interests of his customers.

At this same time, defendants themselves were gathering information about automobile body shredding equipment. In mid-May 1992, they requested from Newell a quote on a "Megashredder," the same type of automobile body shredding equipment Weiner Steel sought to install at its facility.

Defendants made false statements to the public and public officials regarding plaintiffs' proposed automobile body shredding facility; defendants knew their statements about the increased environmental impacts of plaintiffs' proposed facility were groundless, based upon their own plans to install a shredder. They also instituted a baseless appeal of Weiner Steel's precise plan of design, prosecuting it without regard to its merits. Defendants undertook these actions for their own benefit, and their actions were designed to delay plaintiff's entry into the automobile body shredding business and disrupt plaintiffs' business by saddling them with onerous regulatory and administrative costs and burdens.

## CONTENTION

Plaintiffs contend the trial court erred in granting defendants a judgment on the pleadings, in that they have stated a cause of action under the sham exception to the *Noerr-Pennington* doctrine. For the reasons set forth below, we agree.

## DISCUSSION

The *Noerr-Pennington* doctrine provides that there is no antitrust liability under the Sherman Act for efforts to influence government which are protected by the First Amendment right to petition for redress of grievances, even if the motive behind the efforts is anticompetitive. (*Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1133 [270 Cal.Rptr. 1, 791 P.2d 587]; *Blank v. Kirwan* (1985) 39 Cal.3d 311, 320 [216

Cal.Rptr. 718, 703 P.2d 58].) ▇▇▇ An exception to the doctrine arises when efforts to influence government are merely a sham; such efforts are not protected by the *Noerr-Pennington* doctrine and are subject to antitrust liability. (*Id.* at p. 321.)

The doctrine has its genesis in *Eastern R. Conf.* v. *Noerr Motors* (1961) 365 U.S. 127 [5 L.Ed.2d 464, 81 S.Ct. 523]. In *Noerr*, plaintiff truckers alleged a conspiracy in restraint of trade in violation of the Sherman Act by defendant railroads. In general, they alleged defendants had engaged a public relations firm to conduct a publicity campaign against the truckers designed to foster legislation destructive of the trucking industry in order to destroy it as a competitor in the long-distance freight business. (At p. 129 [5 L.Ed.2d at p. 466].) The railroads then filed a counterclaim containing similar allegations against the truckers. (*Id.* at p. 132 [5 L.Ed.2d at p. 468].) The trial court found the railroads' publicity campaign violated the Sherman Act, in that it was malicious and fraudulent; its only purpose was to destroy the truckers as competitors and it used deceptive means. (*Id.* at pp. 132-133 [5 L.Ed.2d at pp. 468-469].) However, it found the truckers' publicity campaign did not violate the Sherman Act, in that it was defensive; the truckers were not trying to destroy competition by the railroads but merely trying to get legislation beneficial to themselves passed. (*Id.* at pp. 134-135 [5 L.Ed.2d at pp. 469-470].)

The United States Supreme Court started its analysis of the case with the principle that the Sherman Act is not violated by mere attempts to influence the passage or enforcement of laws. (*Eastern R. Conf.* v. *Noerr Motors, supra*, 365 U.S. at p. 135 [5 L.Ed.2d at pp. 469-470].) Nor, the court concluded, did the Sherman Act prohibit associations which attempted to persuade the Legislature or the executive to take action with respect to laws which would result in restraint of trade or a monopoly. (*Id.* at p. 136 [5 L.Ed.2d at p. 470].) Since the government is permitted to take such actions, the people must be permitted to make known to the government their wishes that the government do so. (*Id.* at p. 137 [5 L.Ed.2d at pp. 470-471].) If the Sherman Act were interpreted otherwise, it would act essentially to regulate political activity; this was not the purpose of the act. (*Ibid.*) Moreover, since the right of petition is protected by the Bill of Rights, the court was unwilling to impute to Congress an intent to invade this right through the act. (*Id.* at p. 138 [5 L.Ed.2d at pp. 471-472].) Thus, the court concluded the Sherman Act did not "apply to the activities of the railroads at least insofar as those activities comprised mere solicitation of governmental action with respect to the passage and enforcement of laws." (*Ibid.*)

This conclusion was not altered by the fact the railroads' motivation was the destruction of the trucking industry as competition. (*Eastern R. Conf.* v.

*Noerr Motors, supra*, 365 U.S. at pp. 138-139 [5 L.Ed.2d at pp. 471-472].) "The right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws cannot properly be made to depend upon their intent in doing so. It is neither unusual nor illegal for people to seek action on laws in the hope that they may bring about an advantage to themselves and a disadvantage to their competitors." (*Id.* at p. 139 [5 L.Ed.2d at p. 472].)

The court also noted, however, there might be "situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified." (*Eastern R. Conf.* v. *Noerr Motors, supra*, 365 U.S. at p. 144 [5 L.Ed.2d at p. 475].) It concluded this exception to the doctrine enunciated did not apply to the case before it, in that ". . . the railroads were making a genuine effort to influence legislation and law enforcement practices." (*Ibid.*) The court ultimately held the Sherman Act was not violated by the publicity campaigns of either the railroads or the truckers. (*Id.* at p. 145 [5 L.Ed.2d at p. 475].)

In *Mine Workers* v. *Pennington* (1965) 381 U.S. 657 [14 L.Ed.2d 626, 85 S.Ct. 1585], the court reiterated that *Noerr* "shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose. . . . [¶] Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition." (At p. 670 [14 L.Ed.2d at p. 636].)

*California Transport* v. *Trucking Unlimited* (1972) 404 U.S. 508 [30 L.Ed.2d 642, 92 S.Ct. 609] made clear the *Noerr-Pennington* doctrine applies in administrative and judicial as well as legislative contexts, in that ". . . the right to petition extends to all departments of the Government." (At p. 510 [30 L.Ed.2d at p. 646].) *California Transport* involved the sham exception to the doctrine. Respondents alleged petitioners in their challenged actions were not seeking to influence public officials but rather "sought to bar their competitors from meaningful access to adjudicatory tribunals and so to usurp that decisionmaking process." (*Id.* at p. 512 [30 L.Ed.2d at p. 647].) They did this by instituting proceedings regardless of probable cause or the merits of their cases in order to prevent respondents from taking advantage of the processes of the administrative agencies and the courts. (*Ibid.*)

The United States Supreme Court recognized that while unethical conduct may be protected in the legislative arena, "in the setting of the adjudicatory process [it] often results in sanctions." (*California Transport* v. *Trucking*

*Unlimited, supra,* 404 U.S. at p. 512 [30 L.Ed.2d at p. 647].) Certain unethical conduct, "[i]nsofar as the administrative or judicial processes are involved, . . . cannot acquire immunity by seeking refuge under the umbrella of 'political expression' " and may constitute antitrust violations. (*Id.* at p. 513 [30 L.Ed.2d at p. 648].)

The court noted that "[m]isrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process. Opponents before agencies or courts often think poorly of the other's tactics, motions, or defenses and may readily call them baseless. One claim, which a court or agency may think baseless, may go unnoticed; but a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused. That may be a difficult line to discern and draw. But once it is drawn, the case is established that abuse of those processes produced an illegal result, *viz.,* effectively barring respondents from access to agencies and courts." (*California Transport* v. *Trucking Unlimited, supra,* 404 U.S. at p. 513 [30 L.Ed.2d at p. 648].) Allegations in the case before the court that petitioners barred respondents from access to agencies and the courts through their use of administrative and judicial proceedings thus stated a cause of action under the sham exception to the *Noerr-Pennington* doctrine. (*Id.* at p. 516 [30 L.Ed.2d at pp. 649-650].)

The court later explained the sham exception "encompasses situations in which persons use the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." (*Columbia* v. *Omni Outdoor Advertising, Inc.* (1991) 499 U.S. 365, 380 [113 L.Ed.2d 382, 398, 111 S.Ct. 1344], italics in the original.) It "involves a defendant whose activities are 'not genuinely aimed at procuring favorable government action' at all, [citations], not one 'who "genuinely seeks to achieve his governmental result, but does so *through improper means*," ' [citation]." (*Ibid.,* italics in the original.) *California Transport* was "[a] classic example" of a sham situation, in that administrative and judicial actions were taken solely to impose expense and delay, with no expectation of success. (*Ibid.*)

 While the *Noerr-Pennington* doctrine was formulated in the context of antitrust cases, it has been applied or discussed in cases involving other types of civil liability (*City of Long Beach* v. *Bozek* (1982) 31 Cal.3d 527, 533 [183 Cal.Rptr. 86, 645 P.2d 137, A.L.R.4th 2851]; *Gorman Towers, Inc.* v. *Bogoslavsky* (8th Cir. 1980) 626 F.2d 607, 614-615; see *Westfield Partners, Ltd.* v. *Hogan* (N.D.Ill. 1990) 740 F.Supp. 523, 526; *Pennwalt Corp.* v. *Zenith Laboratories, Inc.* (E.D.Mich. 1979) 472 F.Supp. 413, 424), including liability for interference with contractual relations or prospective economic

advantage (*Pacific Gas & Electric Co. v. Bear Stearns & Co., supra,* 50 Cal.3d at pp. 1123, 1133-1134; *First Nat. Bank of Omaha* v. *Marquette Nat. Bank* (D.Minn. 1979) 482 F.Supp. 514, 524; *Sierra Club* v. *Butz* (N.D.Cal. 1972) 349 F.Supp. 934, 938; *King* v. *Levin* (1989) 184 Ill.App.3d 557 [132 Ill.Dec. 752, 540 N.E.2d 492, 499]) or unfair competition (*Blank* v. *Kirwan, supra,* 39 Cal.3d at pp. 320-322). Obviously, the "principle of constitutional law that bars litigation arising from injuries received as a consequence of First Amendment petitioning activity [should be applied], regardless of the underlying cause of action asserted by the plaintiffs." (*Azzar* v. *Primebank, FSB* (1993) 198 Mich.App. 512 [499 N.W.2d 793, 796].) "[T]o hold otherwise would effectively chill the defendants' First Amendment rights." (*First Nat. Bank of Omaha, supra,* at p. 525.)

 In the instant case, the trial court seemed to accept the *Noerr-Pennington* doctrine, or at least the principles underlying it, and its applicability to a case such as the one before it involving causes of action for unfair competition and intentional interference with contractual relations and prospective economic advantage. However, it expressed concern that California courts had never actually applied the sham exception but only discussed it in dicta. It ultimately ruled that defendants' actions were protected under the California Constitution, article I, section 3.

Article I, section 3 of the California Constitution provides in pertinent part: "The people have the right to . . . petition government for redress of grievances . . . ." By contrast, the First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances."

However, in the context of the sham exception to the *Noerr-Pennington* doctrine, the differences in language are irrelevant. As noted in *Clipper Exxpress* v. *Rocky Mountain Motor Tariff* (9th Cir. 1982) 690 F.2d 1240, "[t]he sham exception . . . reflects a judicial recognition that not all activity that appears as an effort to influence government is actually an exercise of the first amendment right to petition. At times this activity, disguised as petitioning, is simply an effort to interfere directly with a competitor. In that case, the 'sham' petitioning activity is not entitled to first amendment protection, *because it is not an exercise of first amendment rights.*" (At p. 1255, italics in the original.) If defendants are simply attempting to interfere with a competitor, not genuinely attempting to petition the government for redress of grievances, then imposing liability for their actions does not interfere with their state constitutional "right to . . . petition government for redress of grievances" (Cal. Const., art. I, § 3).

In discussing the sham exception, *Blank* v. *Kirwan, supra,* points out that genuine efforts to influence government action will not constitute a sham. (39 Cal.3d at p. 322.) But when "the person or persons making such efforts 'invok[es] the process of [governmental] decisionmaking for the injury that *the process alone* will work on competitors' " the efforts are a sham. (*Ibid.,* italics in the original.) Since the person is not seeking redress of grievances through governmental action but rather seeking to use the process for obtaining redress to injure another, allowing imposition of liability will not infringe on that person's right to petition for redress.

*Blank* v. *Kirwan, supra,* while discussing the sham exception, did not apply it. Since the cause of plaintiff's alleged injury was government action itself, not defendants' efforts related to the government action, defendants could bear no liability for the injury and it was unnecessary for the court to apply the *Noerr-Pennington* doctrine or the sham exception. (39 Cal.3d at pp. 322-323.) Similarly, in *Pacific Gas & Electric Co.* v. *Bear Stearns & Co., supra,* the California Supreme Court again set forth the *Noerr-Pennington* doctrine and the sham exception but did not apply them. Instead, it decided the case before it on principles contained in malicious prosecution cases. (50 Cal.3d at pp. 1135, 1137.) However, in neither of these cases did the Supreme Court question the sham exception or suggest it would not apply or should not be applied in California; the sham exception simply was inapplicable to those cases.

 As discussed above, we see no impediment to applying the sham exception in California; it is not inconsistent with the California Constitution. Additionally, there is no reason not to apply it; defendants should not be protected from liability for their torts if they are not engaged in a genuine exercise of their constitutional rights but merely "shamming" exercise of those rights in order to injure their competitors. Accordingly, we hold the sham exception to the *Noerr-Pennington* doctrine is applicable in California.

Defendants argue, however, that even if the sham exception applies in California, it cannot apply to the instant case, in that it applies only in an adjudicatory setting. They point out that one case has called it the " 'sham litigation' " exception (*King* v. *Levin, supra,* 540 N.E.2d at p. 499).

*Noerr* never limited the sham exception to the adjudicatory process only. In fact, it introduced the sham exception in the context of publicity campaigns to influence legislation, noting there could be "situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor

and the application of the Sherman Act would be justified." (*Eastern R. Conf.* v. *Noerr Motors, supra,* 365 U.S. at p. 144 [5 L.Ed.2d at p. 475].)

*California Transport* involved and applied the sham exception in an adjudicatory setting, but the United States Supreme Court did not limit its application to that setting. (*California Transport* v. *Trucking Unlimited, supra,* 404 U.S. at p. 516 [30 L.Ed.2d at pp. 649-650].) More recently, in *Columbia* v. *Omni Outdoor Advertising, Inc., supra,* 499 U.S. 365, the court discussed the sham exception in the context of lobbying activity before the city council. The sham exception was inapplicable not because it did not apply in that setting but because defendant sought to interfere with plaintiff's business relations "not through the very process of lobbying, or of causing the city council to consider zoning measures, but rather through the ultimate product of that lobbying and consideration, viz., the zoning ordinances." (At p. 381 [113 L.Ed.2d at p. 398], italics omitted.) In other words, the sham exception did not apply because the petitioning activity was genuine; it was not inapplicable because it was sought to be applied in a nonadjudicatory setting. (See *id.* at p. 382 [113 L.Ed.2d at p. 399].)

Defendants argue that *Havoco of America, Ltd.* v. *Hollowbow* (7th Cir. 1983) 702 F.2d 643 "best illustrates the inapplicability of the sham exception" to the instant case. *Havoco* involved complaints to the Securities and Exchange Commission allegedly containing false accusations, made to force cancellation of a proposed public offering of stock. (At pp. 648-649.) Defendants cite the following passages to show how *Havoco* illustrates the inapplicability of the sham exception:

"For purposes of this motion, the court treats as undisputed the allegations that defendants registered complaints with the SEC, that as a result the SEC conducted an investigation of Havoco or its subsidiary, and that this investigation caused Havoco to postpone its planned public offering. Such conduct is privileged as petitioning activity and cannot form the basis of a claim for tortious interference with business relationships, unless, as plaintiff argues, defendants' actions were a 'mere sham.'

"In an adjudicatory context, the bringing of a claim that an opponent or even the adjudicatory body itself considers baseless will not ordinarily result in sanctions. [Citations.] However, 'a pattern of baseless, repetitive claims' may establish the 'sham' nature of the petitioning activity and result in the loss of the privilege. [Citation.] . . . Here, there is no pattern of baseless, repetitive claims, although Havoco argues that there is. [Citation.] Defendants have only been pressing one claim, rooted in their displeasure with the management of their investments, and have been seeking a forum in which

to argue the merits of their claim. . . . Havoco is thus left with the argument that defendants claimed to the SEC, not out of any desire to protect their investments or to instigate official action, but solely out of a desire to block the public offering.

". . . The First Amendment guarantees defendants' right to attempt to enlist the government on their side of the dispute. That this petitioning activity may have had incidentally an adverse effect on plaintiff's business, even that defendants knew this and intended such a result, has no effect on the First Amendment's protection, as long as the activity represents a genuine attempt to influence governmental action. [Citations.] Here, the allegations in Havoco's complaint represent the end defendants wanted to achieve: governmental intervention against Havoco. That they were unsuccessful does not automatically transform their attempt into a sham.

"In summary, a plaintiff must do more than merely allege that defendant's petitioning activity was a sham in order to overcome the First Amendment privilege. Otherwise, the right to petition without fear of sanctions would become a mockery. The 'sham' exception cannot be used to chill this constitutional right. [Citations.] Havoco, therefore, must allege facts that demonstrate that defendants' complaints to the SEC were merely a ruse and that defendants were not truly seeking favorable governmental action. Havoco has not done so . . . ." (*Havoco of America, Ltd.* v. *Hollowbow, supra,* 702 F.2d at pp. 650-651.)

*Havoco* did not *hold* the sham exception applies *only* in an adjudicatory context; it merely applied it in such a context. Additionally, it did not hold the exception applies only when there is " 'a pattern of baseless, repetitive claims,' " as defendants here suggest is the case. To the contrary, it stated that such a pattern "*may* establish the sham nature of the petitioning activity." (*Havoco of America, Ltd.* v. *Hollowbow, supra,* 702 F.2d at p. 650, italics added.) After concluding no such pattern was alleged, the court continued its analysis of the allegations of the complaint to see if they nonetheless fit within the sham exception. The court stated that the allegations would have fit had it been alleged "defendants complained to the SEC, not out of any desire to protect their investments or to instigate official action, but solely out of a desire to block the public offering." (*Ibid.*) The court concluded the sham exception was inapplicable only because "Havoco cannot allege any facts" which "demonstrate that defendants' complaints to the SEC were merely a ruse and that defendants were not truly seeking favorable governmental action." (*Id.* at pp. 650, 651.)

In the instant case, plaintiffs alleged defendant Lehrer made false statements about the installation of the automobile body shredding equipment by

plaintiff Weiner Steel to the City of Pico Rivera. After Weiner Steel's precise plan of design for installation of the shredding equipment was approved by the city planning department, Lehrer filed on behalf of defendants Adlen and Aadlen Bros. an appeal of Weiner Steel's precise plan of design *for the purposes of delaying the installation of the shredding equipment, causing plaintiffs undue expense and causing them to abandon their intended entry into the automobile body shredding business.*

Defendants circulated a flyer to residents of Pico Rivera and the surrounding communities. The flyer contained false statements about the automobile body shredding equipment and encouraged the residents to oppose Weiner Steel's precise plan of design. However, Pico Rivera's Design Review Board, after considering Lehrer's appeal, unanimously affirmed the approval of the precise plan of design.

Adlen had informed plaintiffs that Lehrer was his employee and would do anything he asked him to do concerning the appeal of Weiner Steel's precise plan of design. In June, Lehrer stated to a representative of plaintiff Hiuka that he would withdraw his appeal if plaintiffs would agree not to shred automobile bodies. If plaintiffs would not agree, he would attempt to delay further installation of the automobile body shredding equipment by asking the City of Pico Rivera to require Weiner Steel to provide an environmental impact report.

At this same time, defendants themselves were gathering information about automobile body shredding facilities. In mid-May 1992, they requested from Newell a quote on a "Megashredder," the same type of automobile body shredding equipment Weiner Steel sought to install at its facility.

Defendants made false statements to the public and public officials regarding plaintiffs' proposed automobile body shredding facility; defendants knew their statements about the increased environmental impacts of plaintiffs' proposed facility were groundless, based upon their own plans to install a shredder. They also instituted a baseless appeal of Weiner Steel's precise plan of design, prosecuting it without regard to its merits. Defendants undertook these actions for their own benefit, and their actions were designed to delay plaintiff's entry into the automobile body shredding business and disrupt plaintiffs' business by saddling them with onerous regulatory and administrative costs and burdens.

The foregoing allegations show defendants undertook petitioning activity solely to delay or prevent plaintiffs' entry into the shredded automobile body

market through use of "the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon" (*Columbia* v. *Omni Outdoor Advertising, Inc.*, *supra*, 499 U.S. at p. 380 [113 L.Ed.2d at p. 398], italics in the original). Defendants prosecuted their appeal of Weiner Steel's precise plan of design without regard to its merits; they agreed to withdraw the appeal if plaintiffs would agree not to shred automobile bodies but threatened additional obstacles if plaintiffs would not agree; and defendants were working on installing their own automobile body shredder—indicating they had no genuine concern as to its effects on the environment. Defendants were not concerned with stopping plaintiffs' installation of an automobile body shredder through governmental action but through the imposition of costs and burdens associated with the governmental process. Thus, plaintiffs have stated a cause of action under the sham exception (*ibid.*) and the trial court erred in granting defendants a judgment on the pleadings (*Tiffany* v. *Sierra Sands Unified School Dist.*, *supra*, 103 Cal.App.3d at p. 225).

The judgment is reversed. Plaintiffs are to recover their costs on appeal.

Masterson, J., concurred. Vogel (Miriam A.), J., concurred in the disposition only.

A petition for a rehearing was denied May 17, 1994, and respondents' petition for review by the Supreme Court was denied July 21, 1994. Arabian, J., did not participate therein. Lucas, C. J., and Mosk, J., were of the opinion that the petition should be granted.