[No. A112028. First Dist., Div. Three. Jan. 10, 2008.]

THE PEOPLE ex rel. PAUL V. GALLEGOS, as District Attorney, etc., et al., Plaintiffs and Appellants, v.
PACIFIC LUMBER COMPANY et al., Defendants and Respondents.

COUNSEL

Paul V. Gallegos, District Attorney, and Christa K. McKimmy, Deputy District Attorney, for Plaintiffs and Appellants.

Dennis J. Herrera, City Attorney (San Francisco) and Danny Chou, Chief of Appellate Litigation, for the City and County of San Francisco as Amicus Curiae on behalf of Plaintiffs and Appellants.

Morrison & Foerster, Edgar B. Washburn, Christopher J. Carr, William M. Sloan and Shaye Diveley for Defendants and Respondents.

OPINION

**HORNER, J.**[*]—This is an appeal from a judgment in a lawsuit brought by the District Attorney for Humboldt County on behalf of the People of California (the State) under California's unfair competition law, Business and Professions Code section 17200 et seq. (UCL), for alleged fraudulent business practices. Judgment was entered against the State following the sustaining of a demurrer to the second amended complaint. In reaching the judgment, the trial court ruled that respondents the Pacific Lumber Company, Scotia Pacific Company LLC, and Salmon Creek LLC (collectively, Pacific Lumber) were immune from UCL liability under both Civil Code section 47, subdivision (b) and under federal law pursuant to the so-called *Noerr-Pennington* doctrine, and that the State had failed to state a cause of action based on Pacific Lumber's alleged fraudulent business practices. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 24, 2003, the State filed a complaint against Pacific Lumber asserting causes of action arising under the UCL. The allegations in the complaint stemmed from a 1996 agreement between Pacific Lumber, the State of California and the United States known as the Headwaters Agreement. Pursuant to the Headwaters Agreement, Pacific Lumber agreed to sell the Headwaters Forest, an ancient redwood forest, and other land to the state and federal governments for over $300 million and other consideration. In return, Pacific Lumber received assurances from those governments that it would be permitted to harvest certain of its remaining timberlands in

---

[*]Judge of the Alameda Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

accordance with, among other things, a sustained yield plan and habitat conservation plan approved by relevant state and federal agencies.[1]

An exhaustive three-year administrative review process ensued pursuant to the California Environmental Quality Act, Public Resources Code section 21000 et seq. (CEQA), after which the appointed state agency, the California Department of Forestry and Fire Protection (CDF), certified the state's environmental impact report and, on or about March 1, 1999, approved Pacific Lumber's sustained yield plan and habitat conservation plan (referred to herein collectively as the Sustained Yield Plan). Following the issuance of all necessary federal and state permits, the Headwaters Forest purchase was thus completed.[2]

In its original complaint, the State alleged Pacific Lumber intentionally misrepresented and concealed crucial facts during the CEQA administrative proceedings held in connection with the Headwaters Agreement. Pacific Lumber demurred.

Before a hearing was held on Pacific Lumber's demurrer to the original complaint, the State filed a first amended complaint on May 27, 2003, raising essentially the same allegations. The trial court thereafter sustained Pacific Lumber's demurrer to the first amended complaint with leave to amend. The second amended complaint, the subject of this appeal, was then filed May 27, 2004.

In the second amended complaint, the State again alleged Pacific Lumber intentionally misrepresented and concealed crucial facts during the CEQA administrative proceedings held in connection with the Headwaters Agreement. In particular, the State alleged Pacific Lumber submitted a report containing false data in order to obtain approval from the CDF for an increased rate of timber harvesting and to ensure decreased environmental

---

[1] A sustained yield plan is one submitted by a landowner to address "long-term issues of sustained timber production, and cumulative effects analysis which includes issues of fish and wildlife and watershed impacts on a large landscape basis." (Cal. Code Regs., tit. 14, § 1091.1, subd. (b).)

[2] We grant Pacific Lumber's unopposed request for judicial notice of this court's opinion in *Environmental Protection Information Center v. Department of Forestry & Fire Protection* (Cal. App.). (Evid. Code, § 452, subds. (c), (d).) The California Supreme Court granted review March 29, 2006, and thus depublished the opinion. The opinion reflects the fact that on March 31, 1999, the Environmental Protection Information Center and the Sierra Club filed a lawsuit in California court challenging the issuance of certain state permits in connection with the Headwaters Agreement. Somewhat ironically, the California Attorney General has vigorously defended the issuance of those permits on behalf of various state agencies in connection with that litigation, which is still pending in the California Supreme Court, case No. S140547. We do not rely on the opinion as legal precedent. (Cal. Rules of Court, rule 8.1115.)

mitigation requirements. According to the second amended complaint, the false data was submitted to conceal a finding by a consultant hired by Pacific Lumber that new timber harvesting could trigger increased landslide frequency in the Bear Creek and Elk River watersheds. Worried such finding would result in issuance of permits for lower rates of harvesting, and thus would hinder its ability to meet certain of its financial obligations, Pacific Lumber allegedly devised a scheme to submit false data for Jordan Creek, a watershed adjacent to Bear Creek, which indicated, contrary to the Bear Creek and Elk River finding, that new harvesting would not likely trigger increased landslide frequency.

Pacific Lumber allegedly submitted this false data shortly after the end of the 90-day period allowed under CEQA for public review and comment on Pacific Lumber's harvesting plan and on the State of California's environmental impact report.[3] Pacific Lumber then allegedly delayed submitting corrected data for two months, and deliberately delivered the corrected data to the wrong place—to the North Coast Regional Water Quality Control Board and a local office of the CDF—rather than to the government offices designated to review public comments and to make final determinations on Pacific Lumber's permits.

According to the State, Pacific Lumber's submission of false data and delayed submission of corrected data undermined the legitimacy of the CEQA process by (1) precluding the preparation of an accurate environmental impact report open to public review and comment; and (2) allowing for the approval of Pacific Lumber's Sustained Yield Plan and the issuance of permits based on incorrect information. The State thus sought civil penalties and other relief under the UCL to prevent Pacific Lumber from realizing profits on timber harvested pursuant to its allegedly fraudulently obtained Sustained Yield Plan.

The trial court sustained Pacific Lumber's demurrer to the second amended complaint, this time without leave to amend. The trial court reasoned that Pacific Lumber was immune from liability for its communicative conduct in connection with the underlying CEQA administrative proceedings under Civil

---

[3] After a sustained yield plan is submitted and the Director of the CDF determines that it contains sufficient and complete information to permit further review, a 90-day review and comment period ensues, which includes the holding of a public hearing, after which the director decides whether to accept or reject the plan. (Cal. Code Regs., tit. 14, § 1091.10, subds. (a)–(e).) The director's decision is subject to an administrative appeals process and, ultimately, to judicial review. (Cal. Code Regs., tit. 14, § 1091.11; Cal. Code Regs., tit. 14, § 1091.10; Code Civ. Proc., § 1094.5.)

Here, the draft documents available for public review included a combined habitat conservation plan and sustained yield plan, and an environmental impact statement and environmental impact report.

Code section 47, subdivision (b), the so-called "litigation privilege," and under federal law according to the so-called *Noerr-Pennington* doctrine. Judgment was thus entered against the State. This appeal followed.

## DISCUSSION

The State contends on appeal that the trial court erred by applying the litigation privilege under Civil Code section 47, subdivision (b) and the *Noerr-Pennington* doctrine under federal law to Pacific Lumber's alleged wrongful conduct in connection with the CEQA administrative process, and by deciding on demurrer as a matter of law that Pacific Lumber's alleged material concealments and misrepresentations did not undermine the legitimacy of that process.

We address the State's arguments in turn. In doing so, we apply well-established rules governing the appellate review of an order sustaining a demurrer. We thus must "give[] the complaint a reasonable interpretation, and treat[] the demurrer as admitting all material facts properly pleaded." (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967 [9 Cal.Rptr.2d 92, 831 P.2d 317] (*Aubry*).) Because only factual allegations are considered on demurrer, we must disregard any "contentions, deductions or conclusions of fact or law alleged [in the complaint]." (*Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 713 [63 Cal.Rptr. 724, 433 P.2d 732].) Further, because the demurrer at issue is to an amended complaint, we may properly consider allegations asserted in the prior complaints: " '[A] plaintiff may not discard factual allegations of a prior complaint, or avoid them by contradictory averments, in a superseding, amended pleading.' [Citation.]" (*Continental Ins. Co. v. Lexington Ins. Co.* (1997) 55 Cal.App.4th 637, 646 [64 Cal.Rptr.2d 116].)

Where, as here, the trial court has sustained a demurrer, we must determine whether the plaintiff has pleaded facts sufficient to state a cause of action. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58] (*Blank*).) "The judgment must be affirmed 'if any one of the several grounds of demurrer is well taken. [Citations.]' [Citation.]" (*Aubry, supra*, 2 Cal.4th at p. 967.)

Finally, where, as here, the demurrer was sustained without leave to amend, we must determine whether the plaintiff has proven a reasonable possibility that the pleading's defect can be cured by amendment. (*Blank, supra*, 39 Cal.3d at p. 318.) If the plaintiff meets that burden, we must reverse the trial court's order as an abuse of discretion. (*Ibid.*)

*Does the Litigation Privilege Bar the State's UCL Claims?*

The trial court rejected the State's UCL action as a matter of law after finding it barred by Civil Code section 47, subdivision (b) (section 47(b)).

Section 47(b) renders absolutely privileged communications made as part of a "judicial or quasi-judicial proceeding[]." (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 212 [266 Cal.Rptr. 638, 786 P.2d 365] (*Silberg*); see Civ. Code, § 47, subd. (b); *Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1241 [63 Cal.Rptr.3d 398, 163 P.3d 89] (*Action Apartment*).) "The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." (*Silberg, supra*, at p. 212.)

" 'The principal purpose of [the litigation privilege] is to afford litigants and witnesses [citation] the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions. [Citations.]' " (*Action Apartment, supra*, 41 Cal.4th at p. 1241.) Or, as otherwise stated, it "exists to protect citizens from the threat of litigation for communications to government agencies whose function it is to investigate and remedy wrongdoing. [Citation.]" (*Wise v. Thrifty Payless, Inc.* (2000) 83 Cal.App.4th 1296, 1303 [100 Cal.Rptr.2d 437].)

■ To achieve this end, the absolute privilege is interpreted broadly to apply "to *any* communication, not just a publication, having 'some relation' to a judicial [or quasi-judicial] proceeding," irrespective of the communication's maliciousness or untruthfulness. (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 912–913, 920 [120 Cal.Rptr.2d 576]; see *Action Apartment, supra*, 41 Cal.4th at p. 1241; *Silberg, supra*, 50 Cal.3d at p. 216.) And "judicial or quasi-judicial" proceedings are defined broadly to include "all kinds of truth-seeking proceedings," including administrative, legislative and other official proceedings. (*Silberg, supra*, at p. 213.) Further, the privilege " 'is not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards.' (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1057 [39 Cal.Rptr. 3d 516, 128 P.3d 713 (*Rusheen*).)" (*Action Apartment, supra*, at p. 1241.)

Here, the State's UCL action is premised on Pacific Lumber's allegedly fraudulent conduct in communicating information to government agencies during the CEQA administrative proceedings held in connection with the Headwaters Agreement. In particular, the State alleges Pacific Lumber submitted false information in connection with those proceedings with the intent to interfere with the CDF's consideration of Pacific Lumber's Sustained Yield Plan, certification of the State of California's environmental impact report, and issuance of permits for the remaining timberlands under the Headwaters Agreement. As such, Pacific Lumber's communications, whether fraudulent

or not, fall squarely within the scope of the litigation privilege.[4] (*Silberg, supra*, 50 Cal.3d at p. 212 [the litigation privilege protects "communication[s] (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation"]; *Kashian v. Harriman, supra*, 98 Cal.App.4th at p. 920 ["communications made in connection with litigation do not necessarily fall outside the privilege simply because they are, or are alleged to be, fraudulent, perjurious, unethical, or even illegal . . ."]; see also *Mission Oaks Ranch, Ltd. v. County of Santa Barbara* (1998) 65 Cal.App.4th 713, 726–727 [77 Cal.Rptr.2d 1] ["[s]ection 47 applies to the preparation and certification of an EIR [i.e., an environmental impact report]," and thus bars a lawsuit against a consultant for allegedly including false statements in a proposed environmental impact report], overruled on other grounds in *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1123, fn. 10 [81 Cal.Rptr.2d 471, 969 P.2d 564]; *Pettitt v. Levy* (1972) 28 Cal.App.3d 484, 488 [104 Cal.Rptr. 650] ["Any publication made in a city planning commission or city council proceedings is within the protection of [Civil Code section 47] though the proceedings are not strictly judicial"]; *id.* at pp. 489–490 [§ 47 bars a lawsuit by property owners against certain individuals for allegedly preparing and presenting false documentary evidence in connection with opposing the owners' building permit application].)

■  While accepting that communications like those challenged here generally fall within the litigation privilege, the State nonetheless claims the privilege is inapplicable in this case because it arises under the UCL rather than under general tort laws. The UCL forbids acts of "unfair competition," which is defined to include "any unlawful, unfair or fraudulent business act or practice." (Bus. & Prof. Code, § 17200; see *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527] (*Cel-Tech*).) The UCL is broad in scope, embracing " ' " 'anything that can properly be called a business practice and that at the same time is forbidden by law.' " ' [Citation.]" (*Cel-Tech*, at p. 180.) The UCL's scope is not, however, unlimited. (*Cel-Tech*, at pp. 182–184.) Of relevance here, for example, it "does not permit an action that another statute expressly precludes." (*Id.* at p. 184.) As such, "[w]hen specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor." (*Id.* at p. 182.) Here, the trial court found that section 47(b) provided such a safe harbor. For reasons discussed below, we agree.

---

[4] An exception to the litigation privilege exists where the communication was made in connection with judicial or quasi-judicial proceedings not instigated in good faith. (E.g., *Action Apartment, supra*, 41 Cal.4th at p. 1251.) Here, however, no such lack of good faith has been alleged with respect to Pacific Lumber's petitioning of the government in connection with the Headwaters Agreement. As such, we have no reason to consider this exception.

In *Rubin v. Green* (1993) 4 Cal.4th 1187 [17 Cal.Rptr.2d 828, 847 P.2d 1044] (*Rubin*), our Supreme Court specifically examined the safe harbor provided by section 47(b) in an action brought under the UCL. There, the plaintiff, the owner of a mobilehome park, sued a park resident and her attorneys for, among other things, improper solicitation by the attorneys in anticipation of litigation against the plaintiff over park conditions. (*Rubin, supra,* at pp. 1190–1192.) Acknowledging that the alleged acts of attorney solicitation fell squarely within the litigation privilege, the plaintiff argued the case should nonetheless proceed because, unlike ordinary tort laws, the UCL grants any member of the public standing to seek relief for unfair competition. (*Rubin, supra,* at p. 1200.)

■ The court disagreed, "reject[ing] the claim that a plaintiff may, in effect, 'plead around' absolute barriers to relief by relabeling the nature of the action as one brought under the unfair competition statute." (*Rubin, supra,* 4 Cal.4th at p. 1201.) The court thus concluded that, where the conduct alleged in the complaint comes within the scope of section 47(b), and is thus "absolutely immune from civil tort liability," "[t]o permit the same . . . acts to be the subject of an injunctive relief proceeding brought by this same plaintiff under the [UCL] undermines that immunity. If the policies underlying section 47(b) are sufficiently strong to support an absolute privilege, the resulting immunity should not evaporate merely because the plaintiff discovers a conveniently different label for pleading what is in substance an identical grievance arising from identical conduct as that protected by section 47(b)." (*Rubin, supra,* at pp. 1202–1203.)

Relying on dicta found elsewhere in *Rubin,* the State and amicus curiae argue this holding does not apply here because, unlike in *Rubin,* the State, as plaintiff, (1) was not a party to the underlying CEQA proceedings; and (2) is a governmental entity suing on behalf of the public rather than a private litigant. We reject both contentions.

As an initial matter, we disagree the State was not a party to the underlying CEQA proceedings. The State of California was a party to the Headwaters Agreement and, in the CEQA proceedings, several state agencies, including the CDF and the Department of Fish and Game participated on behalf of the State. Indeed, the state Attorney General continues to defend the outcome of those proceedings on behalf of the People in a case now pending before the California Supreme Court, *Environmental Protection Information Center v. Department of Forestry & Fire Protection,* S140547.■ It is thus clear the People's interests were adequately represented in the CEQA proceedings (the State does not contend otherwise), and that, as such, those proceedings, not this litigation, provided the more appropriate forum in which to "expos[e] . . . the bias of witnesses and the falsity of evidence, thereby enhancing the

finality of judgments and avoiding an unending roundelay of litigation, an evil far worse than an occasional unfair result. [Citations.]" (*Silberg, supra*, 50 Cal.3d at p. 214.) That the People are being represented in this case by the District Attorney of Humboldt County rather than by the State Attorney General or a state agency does not change that fact.

Moreover, putting this conclusion aside, we disagree with the State that, under *Rubin*, "the litigation privilege does not preclude lawsuits under [the UCL] by non-party litigants." Rather, the *Rubin* court expressly limited its holding to "the precise circumstances before [it]," including the circumstance that the same plaintiff was involved against the same defendants in the prior litigation, and that "both the State Bar and prosecutorial authorities are authorized to pursue additional sanctions against attorney solicitation of the sort alleged in the amended complaint." (*Rubin, supra*, 4 Cal.4th at pp. 1203–1204.) And the California Supreme Court has clarified since *Rubin* that no "broad exception [exists] to the litigation privilege for any party who did not participate in the underlying litigation" because such exception "would be antithetical to the privilege's purposes." (*Action Apartment, supra*, 41 Cal.4th at p. 1247.) "Derivative litigation brought by parties who did not participate in the underlying litigation, like litigation brought by parties who did participate, would pose an external threat of liability that would deter potential litigants, witnesses, and others from participating in judicial proceedings."[5] (*Action Apartment*, at p. 1248.)

We acknowledge that, in so concluding, our Supreme Court left open the possibility that the Legislature could create exceptions to the litigation privilege for both parties and nonparties to the prior proceedings. (*Action Apartment, supra*, 41 Cal.4th at p. 1247.) According to the State and amicus curiae, the Legislature created such an exception for UCL actions brought on behalf of the public by governmental entities. In so arguing, the State points to CEQA's savings clause, which provides that "[n]o provision of this division is a limitation or restriction on the power or authority of any public agency in the enforcement or administration of any provision of law which it is specifically permitted or required to enforce or administer . . . ." (Pub.

---

[5] On this point, the California Supreme Court appears to reject language in two of the State's authorities, *Kashian v. Harriman, supra*, 98 Cal.App.4th at page 924, and *American Products Co., Inc. v. Law Offices of Geller, Stewart & Foley, LLP* (2005) 134 Cal.App.4th 1332, 1346 [37 Cal.Rptr.3d 93], suggesting that a UCL action survives the litigation privilege so long as the plaintiff is not a party to the earlier litigation.

Resources Code, § 21174.) The State and amicus curiae also point again to dicta in *Rubin*, which states "that the policy underlying the unfair competition statute can be vindicated by multiple parties other than plaintiff," including "the Attorney General, district attorneys, and certain city attorneys." (*Rubin, supra*, 4 Cal.4th at p. 1204.) We conclude neither source provides authority for an exception to the litigation privilege for enforcement actions brought by governmental entities under the UCL.

With respect to CEQA's savings clause, we find within it no legislative intent to override the litigation privilege's absolute protection of access to courts and other quasi-judicial bodies. Indeed, the clause gives governmental entities no additional authority whatsoever, but rather simply acknowledges and preserves their existing authority. (Pub. Resources Code, § 21174.) Thus, absent some other, independent source of authority to pierce the litigation privilege, the savings clause is irrelevant to our inquiry. (See *Action Apartment, supra*, 41 Cal.4th at p. 1245.)

■ Nor do we find within *Rubin*'s dicta an independent source of authority to pierce the litigation privilege. First, as we touched upon above, the *Rubin* court had no reason, given the facts before it, to consider a broad exception to the privilege for enforcement actions brought by governmental entities under the UCL. Second, we believe such exception, at least so broadly stated, would run counter to our Supreme Court's insistence, given the importance of the privilege's absolute protection of access to official proceedings, that litigants, whatever their identity, should not be permitted to plead around the privilege absent clear legislative intent to the contrary. (*Action Apartment, supra*, 41 Cal.4th at pp. 1247–1248; see also *Rubin, supra*, 4 Cal.4th at pp. 1202–1203.) That legislative intent does not exist here.

The UCL, unlike other statutes that courts have determined were intended by the Legislature to withstand the litigation privilege, is not necessarily "more specific than the litigation privilege and would [not] be significantly or wholly inoperable if its enforcement were barred when in conflict with the privilege." (*Action Apartment, supra*, 41 Cal.4th at pp. 1246–1247 [noting, for example, that "[t]he crimes of perjury and subornation of perjury would be almost without meaning if statements made during the course of litigation were protected from prosecution for perjury by the litigation privilege" and that "[t]he misdemeanors established by Business and Professions Code section 6128 evince a legislative intent that certain attorney conduct not be

protected from prosecution by the litigation privilege: 'Every attorney is guilty of a misdemeanor who either: [¶] (a) Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party. [¶] (b) Willfully delays his client's suit with a view to his own gain. [¶] (c) Willfully receives any money or allowance for or on account of any money which he has not laid out or become answerable for.' " (Fns. omitted.)].)[6] Nor do we find, or has the State or amicus curiae pointed to, any other "irreconcilable conflicts" between the litigation privilege and the UCL upon which to base an exception. (*Action Apartment, supra*, at p. 1247.)

■ Further, as Pacific Lumber points out, several courts have recognized that the litigation privilege applies to claims brought *against* public entities. (E.g., *Braun v. Bureau of State Audits* (1998) 67 Cal.App.4th 1382, 1394 [79 Cal.Rptr.2d 791]; *People v. Health Laboratories of North America, Inc.* (2001) 87 Cal.App.4th 442, 450 [104 Cal.Rptr.2d 618].) To then decline to apply the privilege to claims brought *by* public entities, under the UCL or any other statute, would indeed be inequitable.

■ For these reasons, we agree with the trial court that section 47(b) bars this action. ■ Indeed, to conclude otherwise, we believe, would be inconsistent with our mandate to resolve "[a]ny doubt about whether the [litigation] privilege applies . . . in favor of applying it. [Citation.]" (*Kashian v. Harriman, supra*, 98 Cal.App.4th at pp. 912–913.) As several California courts have explained in recognizing that the litigation privilege has its costs, " '[I]t is desirable to create an absolute privilege . . . not because we desire to protect the shady practitioner, but because we do not want the honest one to have to be concerned with [subsequent derivative] actions . . . .' " (*Silberg, supra*, 50 Cal.3d at p. 214, quoting *Thornton v. Rhoden* (1966) 245 Cal.App.2d 80, 99 [53 Cal.Rptr. 706].)

In so holding, we acknowledge the State's and amicus curiae's argument that UCL actions brought by governmental entities on the People's behalf serve important law enforcement purposes. However, the California Supreme Court has already made clear that fact alone does not warrant erosion of the absolute litigation privilege. Acknowledging in *Action Apartment* that the City of Santa Monica may have been motivated by a "legitimate government purpose" in adopting a city ordinance prohibiting landlords from bringing actions to recover rental units without a reasonable factual or legal basis, it

---

[6] Despite the language in *Rubin* quoted above discussing the broad standing principles of the UCL, that decision nowhere recognizes a legislative intent within the UCL to permit enforcement actions brought by governmental entities that would otherwise be barred by section 47(b). To the contrary, *Rubin* focused on the fact that *the State Bar* is excepted from the litigation privilege in its enforcement of the antisolicitation statute. (*Rubin, supra*, 4 Cal.4th at p. 1198; see also *Action Apartment, supra*, 41 Cal.4th at pp. 1246–1247.)

nonetheless held that "[t]he City's enforcement of the provision . . . that creates a civil and criminal cause of action based on the act of initiating litigation would cut against the litigation privilege's 'core policy' of protecting access to the courts. [Citation.] Knowing that the City or any other person could bring [such an enforcement action] . . . would have a chilling effect on landlords pursuing evictions through the courts." (*Action Apartment, supra*, 41 Cal.4th at p. 1244.) The same chilling effect would occur here, we fear, were this lawsuit to proceed.

### Does the Noerr-Pennington *Doctrine Bar the State's UCL Claims?*

Because section 47(b) bars this action, we need not address the State's remaining arguments for reversing the trial court's ruling on demurrer. (*Aubry, supra*, 2 Cal.4th at p. 967 ["[t]he judgment must be affirmed 'if any one of the several grounds of demurrer is well taken' "].) We nonetheless briefly address the State's *Noerr-Pennington* argument, given the parties' and amicus curiae's extensive briefing of the issue.

■ Under the *Noerr-Pennington* doctrine, "[t]hose who petition government . . . are generally immune from antitrust liability."[7] (*Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.* (1993) 508 U.S. 49, 56 [123 L.Ed.2d 611, 113 S.Ct. 1920] (*Professional Real Estate Investors*); see also *Blank, supra*, 39 Cal.3d at p. 320 ["the *Noerr-Pennington* doctrine declares that efforts to influence government action are not within the scope of the Sherman Act, regardless of anticompetitive purpose or effect"].) "This doctrine relies on the constitutional right to petition for redress of grievances to establish that there is no antitrust liability for petitioning any branch of government, even if the motive is anticompetitive."[8] (*Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1133 [270 Cal.Rptr. 1, 791 P.2d 587].) The doctrine further relies on principles of comity, "i.e., noninterference on the part of the courts with governmental bodies that may validly cause otherwise anticompetitive effects and with efforts intended to influence such bodies." (*Blank, supra*, 39 Cal.3d at p. 321.)

■ The *Noerr-Pennington* doctrine has been extended to preclude virtually all civil liability for a defendant's petitioning activities before not just courts, but also before administrative and other governmental agencies.

---

[7] The doctrine derives from the holdings of the United States Supreme Court in *Eastern R. Conf. v. Noerr Motors* (1961) 365 U.S. 127 [5 L.Ed.2d 464, 81 S.Ct. 523] (*Noerr*), and *Mine Workers v. Pennington* (1965) 381 U.S. 657 [14 L.Ed.2d 626, 85 S.Ct. 1585] (*Pennington*), and "rest[s] on statutory interpretation." (*Blank, supra*, 39 Cal.3d at p. 321.)

[8] "The right to petition for redress of grievances is [protected by both] the [California] and [United States] Constitutions. (U.S. Const., 1st Amend.; Cal. Const., art. I, § 3.)" (*Pacific Gas & Electric Co. v. Bear Stearns & Co., supra*, 50 Cal.3d at p. 1133, fn. 15.)

(*California Transport v. Trucking Unlimited* (1972) 404 U.S. 508, 510–511 [30 L.Ed.2d 642, 92 S.Ct. 609] (*California Transport*); *Ludwig v. Superior Court* (1995) 37 Cal.App.4th 8, 21, fn. 17 [43 Cal.Rptr.2d 350] ["the principle applies to virtually any tort, including unfair competition and interference with contract"].) Indeed, " '[i]t would be destructive of rights of association and of petition to hold that groups with common interests may not . . . use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting *resolution of their business and economic interests vis-à-vis their competitors.*' (*California Transport* v. *Trucking Unlimited*[, *supra*,] 404 U.S. [at pp.] 510–511 [30 L.Ed.2d 642, 646, 92 S.Ct. 609]; italics added.)" (*Matossian v. Fahmie* (1980) 101 Cal.App.3d 128, 136 [161 Cal.Rptr. 532].)

■ As our California Supreme Court has explained: "It is only when efforts to influence government action are a 'sham' that they fall outside the protection of the *Noerr-Pennington* doctrine and within the scope of the Sherman Act. (*California Transport*, 404 U.S. at pp. 511–516 [30 L.Ed.2d at pp. 646–649]; *Noerr*, 365 U.S. at p. 144 [5 L.Ed.2d at p. 475]; see generally Areeda, Antitrust Law (1982 supp.) [¶¶ 202, pp. 4–5 [hereafter Areeda, Antitrust Supplement].) Such efforts amount to a sham when though 'ostensibly directed toward influencing governmental action, . . . [they are] actually nothing more than an attempt to interfere directly with the business relationships of a competitor . . . .' (*Noerr, supra*, at p. 144 [5 L.Ed.2d at p. 475].) Such efforts, by contrast, do not amount to a sham when, no matter how anticompetitive in purpose or effect, they constitute a 'genuine effort to influence [government action] . . . .' (*Ibid.*) In other words, efforts to influence government action are a sham only when the person or persons making such efforts 'invok[es] the process of [governmental] decisionmaking for the injury that *the process alone* will work on competitors . . . .' (*Litton Systems, Inc.* v. *American Tel. & Tel. Co.* (2d Cir. 1983) 700 F.2d 785, 810, italics added; accord, Handler & De Sevo, *supra*, 6 Cardozo L.Rev. at pp. 7–14.)" (*Blank, supra*, 39 Cal.3d at pp. 321–322; see also *Hi-Top Steel Corp. v. Lehrer* (1994) 24 Cal.App.4th 570, 578–579 [29 Cal.Rptr.2d 646] (*Hi-Top Steel*).)

■ Following the California Supreme Court's decision in *Blank*, the United States Supreme Court clarified the so-called "sham exception" to the *Noerr-Pennington* doctrine, setting forth a two-part test for determining whether a defendant's petitioning activities fall within its reach: "first, it 'must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits'; second, the litigant's subjective motivation must 'concea[l] an attempt to interfere *directly* with the business relationships of a competitor . . . through the use [of] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon.' " (*BE&K Constr. Co. v. NLRB* (2002) 536 U.S. 516, 526 [153 L.Ed.2d 499, 122 S.Ct. 2390] (*BE&K*), quoting *Professional Real Estate*

*Investors, supra*, 508 U.S. at pp. 60–61; see also *Wolfgram v. Wells Fargo Bank* (1997) 53 Cal.App.4th 43, 54–55 [61 Cal.Rptr.2d 694].) To meet this test, the defendant's petitioning activities thus "must be a sham *both* objectively and subjectively." (*BE&K, supra*, at p. 526; see also *Wolfgram, supra*, at pp. 54–55.)

Here, the State contends Pacific Lumber's petitioning activities fall within the sham exception, and thus enjoy no *Noerr-Pennington* immunity. We disagree. Pacific Lumber's activities in connection with the CEQA administrative proceedings constituted a "genuine effort to influence [government action]." (*Noerr, supra*, 365 U.S. at p. 144.) Designed to secure approval of its Sustained Yield Plan, the company's effort was neither " 'objectively baseless' " in the sense that no reasonable litigant could realistically expect success on the merits, nor did it conceal an attempt to interfere with a competitor's business relationships " 'through the use [of] the governmental *process*—as opposed to the *outcome* of that process.' " (*BE&K, supra*, 536 U.S. at p. 526; see also *Wolfgram, supra*, 53 Cal.App.4th at p. 54 ["absent 'a patent lack of merit, an action protected under the First Amendment by the right of petition cannot be the basis for litigation . . .' "].) Indeed, according to the State's own allegations, Pacific Lumber achieved the very outcome it petitioned for in the CEQA proceedings—permission to harvest timber at a desirable annual rate. (Cf. *Hi-Top Steel, supra*, 24 Cal.App.4th at pp. 582–583 [a cause of action under the sham exception was stated where the "allegations show defendants undertook petitioning activity solely to delay or prevent plaintiffs' entry into the shredded automobile body market through use of 'the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon' [citation] . . ."].) That Pacific Lumber is alleged to have employed improper tactics in seeking that outcome does not render their efforts less genuine. (*Blank, supra*, 39 Cal.3d at p. 325 ["[f]or the purposes of the *Noerr-Pennington* doctrine, . . . impropriety and genuineness are not related . . ."].)

Apparently conceding Pacific Lumber's conduct fails to meet the two-part test for the sham exception put forth by the United States Supreme Court, the State and amicus curiae rely primarily on federal cases to suggest the exception nonetheless applies because allegations are raised of fraudulent conduct in the context of an adjudicatory proceeding. Specifically, they contend "[t]he utterance of knowing and reckless falsehoods that affect the outcome of a government agency's adjudicatory determination . . . are not protected by the *Noerr-Pennington* doctrine."

In so arguing, the State admits that the United States Supreme Court has not recognized an exception to the *Noerr-Pennington* doctrine based on a defendant's fraudulent conduct. (See *Professional Real Estate Investors,*

*supra,* 508 U.S. at p. 61, fn. 6 [suggesting an open question remains whether there is a fraud-based exception to the *Noerr-Pennington* doctrine].) The State argues, however, that the following language in *California Transport* suggests such an exception would be appropriate: "There are many . . . forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations. Misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process. Opponents before agencies or courts often think poorly of the other's tactics, motions, or defenses and may readily call them baseless. One claim, which a court or agency may think baseless, may go unnoticed; but a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused. That may be a difficult line to discern and draw. But once it is drawn, the case is established that abuse of those processes produced an illegal result, *viz.,* effectively barring respondents from access to the agencies and courts. Insofar as the administrative or judicial processes are involved, actions of that kind cannot acquire immunity by seeking refuge under the umbrella of 'political expression.' " (*California Transport, supra,* 404 U.S. at p. 513.)

While a split of authority exists, several federal courts have relied on this language to extend the sham exception to cover certain fraudulent acts, at least when done in the adjudicatory context. In *Kottle v. Northwest Kidney Centers* (9th Cir. 1998) 146 F.3d 1056, 1060, for example, the court recognized that "in the context of a judicial proceeding, if the alleged anticompetitive behavior consists of making intentional misrepresentations to the court, litigation can be deemed a sham if 'a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy.' (*Liberty Lake Inv., Inc. v. Magnuson,* 12 F.3d 155, 158 (9th Cir. 1993); *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.,* 690 F.2d 1240, 1260 (9th Cir. 1982)." (See also *Potters Medical Center v. City Hosp. Ass'n* (6th Cir. 1986) 800 F.2d 568, 580 ["the knowing and willful submission of false facts to a government agency falls within the sham exception . . ."]; but see *Armstrong Surgical v. Armstrong Memorial Hosp.* (3d Cir. 1999) 185 F.3d 154, 160–164 & fn. 7 [disagreeing with *Kottle* and other authority that an exception exists for knowingly submitting false information to an adjudicative body]; *Baltimore Scrap Corp. v. David J. Joseph Co.* (4th Cir. 2001) 237 F.3d 394, 402, 404 (*Baltimore Scrap*) [declining to reach the question of "whether a fraud exception to *Noerr-Pennington* still exists after [*Professional Real Estate Investors*]" where "[plaintiff] cannot show that the state court judgment was procured by fraud or deceit," and noting that "[a] broad fraud exception would allow federal collateral litigation over conduct in state courts that never affected the core of a state judgment . . ."].) The *Kottle* court went on to conclude that

administrative bodies are equivalent to judicial ones for purposes of the sham exception when such bodies act "in an 'adjudicatory' capacity," meaning "their actions are guided by enforceable standards subject to review . . ." rather than by political discretion. (*Kottle, supra,* 146 F.3d at pp. 1061–1062 & fn. 5.)

Here, relying on *Kottle,* the State and amicus curiae contend the CEQA proceedings were akin to judicial ones for purposes of the sham exception because, under the relevant rules and regulations, the CDF made factual findings based upon evidence submitted in connection with public hearings, and because the agency's ultimate decisions were subject to judicial review. (See, e.g., Cal. Code Regs., tit. 14, § 1091.10; Code Civ. Proc., § 1094.5.)

Regardless of whether the CEQA proceedings are characterized as judicial or adjudicatory for other purposes, we would decline to hold that the State's fraud-based allegations meet the requirements of the sham exception for purposes of the *Noerr-Pennington* doctrine. First, as stated above, the United States Supreme Court has not expanded the sham exception to cover such allegations, or recognized an independent fraud-based exception. (*Professional Real Estate Investors, supra,* 508 U.S. at p. 61, fn. 6.) Moreover, the United States Supreme Court has recently confirmed that conduct falls within the sham exception only if it is, unlike here, objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits *and* subjectively motivated by an unlawful purpose.[9] (*BE&K, supra,* 536 U.S. at p. 526.) In doing so, the court noted that "while false statements may be unprotected for their own sake, '[t]he First Amendment requires that we protect some falsehood in order to protect *speech that matters.*' *Gertz* v. *Robert Welch, Inc.,* 418 U.S. 323, 341 [41 L.Ed.2d 789, 94 S.Ct. 2997] (1974) (emphasis added); *id.,* at 342 (noting the need to protect some falsehoods to ensure that 'the freedoms of speech and press [receive] that "breathing space" essential to their fruitful exercise' (quoting *NAACP* v. *Button,* 371 U.S. 415, 433 [9 L.Ed.2d 405, 83 S.Ct. 328] (1963)))." (*BE&K, supra,* 536 U.S. at p. 531.)

Further, no California court has expanded the sham exception beyond the two-part standard set forth in *Professional Real Estate Investors,* despite citing to *California Transport* and, in at least one case, acknowledging its language setting apart misrepresentations made in the adjudicatory context. (See *Hi-Top Steel, supra,* 24 Cal.App.4th at p. 577; *Blank, supra,* 39 Cal.3d at pp. 321–322.)

▮▮▮ In declining to expand the sham exception to cover Pacific Lumber's conduct, we also note the California Supreme Court's concern for comity

---

[9] Indeed, here, Pacific Lumber did in fact have success on the merits in connection with the CEQA proceedings. (See *Blank, supra,* 39 Cal.3d at p. 325 [where defendants' efforts to influence governmental action were successful, they could not be "deemed a mere sham"].)

with respect to governmental decisionmaking when applying the *Noerr-Pennington* doctrine. (*Blank, supra,* 39 Cal.3d at p. 321.) Pacific Lumber's challenged activities were directed at the CDF and other independent state agencies engaged, pursuant to California law, in the CEQA process. We have already determined those activities were genuinely intended to influence government action, not mere sham activities intended to use governmental processes to interfere with a competitor's business relationships. The CDF rendered its ultimate decisions—adopting "Sustained Yield Plan Alternative 25," certifying the environmental impact report, and issuing the relevant permits—after an extensive public decisionmaking process that produced an administrative record approximating 80,000 pages. Courts, we believe, should not lightly interfere with such administrative proceedings, particularly where, as here, a substantial period of time has elapsed since their conclusion. (See *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1130–1132 [26 Cal.Rptr.2d 231, 864 P.2d 502] [noting that an agency-approved environmental impact report is presumed valid if not challenged within the CEQA statute of limitations period and discussing the legislative intent to streamline the CEQA process so as not to "unduly prolong[] [it]"]; see also *Baltimore Scrap, supra,* 237 F.3d at p. 404 [holding, in declining to recognize a broad fraud exception to the *Noerr-Pennington* doctrine, that "[i]t is simply not the role of federal courts . . . to reconsider the underlying validity of a state zoning contest . . ."].)

*Was the Underlying Administrative Process Deprived of Legitimacy?*

Finally, even were we to recognize an expansion of the sham exception for fraudulent conduct in adjudicatory proceedings, we would nonetheless conclude that the fraudulent conduct alleged here is not actionable because the State has failed to adequately allege that it deprived the CEQA proceedings of legitimacy. (See *Kottle, supra,* 146 F.3d at p. 1060; *Baltimore Scrap, supra,* 237 F.3d at pp. 401–402 ["[i]f a fraud exception to *Noerr-Pennington* does exist, it extends only to the type of fraud that deprives litigation of its legitimacy . . ."].)

As has already been discussed, the CDF was called upon in the underlying proceedings to determine, among other things, whether Pacific Lumber's Sustained Yield Plan had a sufficient informational and analytical basis (in particular, with respect to potential adverse environmental impacts), and whether it was consistent with certain environmental and economic values.

(Cal. Code Regs., tit. 14, §§ 1091.1, 1091.2, 1091.5–1091.10.) The CDF independently reviewed the plan, requested and received additional information regarding the plan from Pacific Lumber, solicited comments from other public agencies, and then held a public hearing at which all interested persons, including other public agencies, were entitled to testify and present evidence. (Cal. Code Regs., tit. 14, § 1091.10.) At the conclusion of those events, the Director of the CDF rendered a written decision on February 25, 1999, to adopt "Sustained Yield Plan Alternative 25(a)" to regulate Pacific Lumber's rate of timber harvesting in connection with the Headwaters Agreement and to certify the environmental impact report. (Cal. Code Regs., tit. 14, § 1091.10.) This decision, according to the State's allegations, led to a campaign of aggressive lobbying by Pacific Lumber to encourage the CDF to adopt instead a Sustained Yield Plan with a more favorable rate of timber harvesting. The CDF eventually obliged, adopting on March 1, 1999, Sustained Yield Plan Alternative 25, a less restrictive plan than Sustained Yield Plan Alternative 25(a), which, consistent with Pacific Lumber's lobbying efforts, increased the permissible annual rate of timber harvesting.

With respect to the alleged fraudulent conduct, the State contends Pacific Lumber submitted false data regarding landslide frequency at the Jordan Creek watershed on November 18, 1998, two days after the close of the public comment period on the environmental impact report and the company's proposed Sustained Yield Plan. It is unclear from the pleadings whether the CDF actually considered Pacific Lumber's allegedly fraudulent submission in rendering its ultimate decision to adopt Sustained Yield Plan Alternative 25 and to certify the environmental impact report.[10] The pleadings and the record are clear, however, that Pacific Lumber's *corrected* submission was available to the CDF, or at a minimum to its local counterpart, on or soon after January 22, 1999—before the CDF adopted the *more restrictive* Sustained Yield Plan Alternative 25(a) on February 25, 1999.[11] Further, under the pleadings, the State does not ultimately challenge the CDF's adoption of Sustained Yield Plan Alternative 25(a); rather, it challenges the CDF's adoption on March 1, 1999, of the *less restrictive* Sustained Yield Plan Alternative 25. Not only was the corrected data available over a month before Sustained Yield Plan Alternative 25 was adopted, but, according to the

---

[10] It is undisputed the CDF had in its possession several other reports contradicting the false data Pacific Lumber allegedly submitted regarding the Jordan Creek watershed.

[11] The State alleges Pacific Lumber should have delivered the corrected data to the "designated [governmental] offices" rather than to the local offices of the CDF and the North Coast Regional Water Quality Control Board. As the trial court points out, however, it was the North Coast Regional Water Quality Control Board, not the "designated [governmental] offices," that requested the data regarding the Jordan Creek watershed. Moreover, the State nowhere alleges that the designated office, i.e., the state office of the CDF, failed to receive the corrected data from its local counterpart or another source.

allegations, the plan's adoption followed on the heels of a period of aggressive lobbying by Pacific Lumber, not on the heels of its submission of fraudulent data. As such, it is unclear how the earlier submitted fraudulent data, even assuming the CDF considered it, could, as the State alleges, have led the agency to adopt the less restrictive Sustained Yield Plan Alternative 25, thereby undermining the legitimacy of the CEQA process. Rather, it appears from the pleadings that Pacific Lumber's lobbying efforts, not its prior fraudulent submission, led to the adoption of the less restrictive plan. (See *Baltimore Scrap Corp. v. David J. Joseph Co.* (D.Md. 2000) 81 F.Supp.2d 602, 619 [administrative proceedings were not deprived of legitimacy by the alleged fraud for purposes of *Noerr-Pennington* where "[e]ven if [the plaintiff] could establish that the report [submitted to the agency] contained deliberately false information," there was "no evidence that the report played a role in the [agency's] decision"], affd. by *Baltimore Scrap, supra*, 237 F.3d 394.) Pacific Lumber's lobbying efforts, which are not alleged to have been fraudulent or deceptive, constitute a classic form of political expression, and are thus undoubtedly immune from liability under *Noerr-Pennington*. (*Noerr, supra*, 365 U.S. at pp. 137–138 [defendant railroad company's lobbying efforts were held to be immune from liability because "[i]n a representative democracy such as this . . . the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives . . ."].)

Given the undisputed presence of disinterested decision makers at the CDF as well as other state agencies, the extensive independent review and analysis of Pacific Lumber's proposed harvesting plan, the public hearing open to all interested persons and agencies, and the review process that was available for correcting any identifiable errors (including misrepresentations) in a timely fashion, we are thus disinclined to conclude the CEQA proceedings were rendered illegitimate by Pacific Lumber's alleged submission of fraudulent data—which indeed was corrected over a month before issuance of the CDF's ultimate decision.

In reaching this decision, we agree with the State that the trial court had no discretion to weigh the evidence in ruling on Pacific Lumber's demurrer. However, "while the court does not weigh evidence, it must determine whether plaintiffs have demonstrated evidence which, *if credited*, would justify their prevailing at trial." (*Blanchard v. DIRECTV, Inc.* (2004) 123 Cal.App.4th 903, 921 [20 Cal.Rptr.3d 385].) Here, for the reasons discussed above, we conclude the State's evidence, even if credited, would not justify its prevailing at trial. Further, we conclude the State has failed to prove, on its third try, a reasonable possibility that the operative pleading's defect can be cured by amendment. (*Blank, supra*, 39 Cal.3d at p. 318.) As such, we affirm the trial court's judgment.

## DISPOSITION

The judgment is affirmed.

Pollak, Acting P. J., and Siggins, J., concurred.

On February 1, 2008, the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied April 23, 2008, S161003. George, C. J., did not participate therein.