Filed 12/26/24  Centerline Logistics v. Inlandboatmen's Union of the Pacific CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| CENTERLINE LOGISTICS CORPORATION et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> INLANDBOATMEN'S UNION OF THE PACIFIC et al., <br><br> Defendants and Respondents. | B325276 <br><br> Los Angeles County <br> Super. Ct. No. 21LBCV00633 |

APPEAL from orders and judgment of the Superior Court of Los Angeles County, Michael P. Vicencia, Judge.  Affirmed.

Davis Grimm Payne & Marra, Christopher L. Hilgenfeld and Daniel J. Spurgeon for Plaintiffs and Appellants.

Leonard Carder, Emily M. Maglio; Barnard Iglitzin & Lavitt, Darin M. Dalmat and Sarah E. Derry for Defendant and Respondent Inlandboatmen's Union of the Pacific.

Slaughter, Reagan & Cole, Barry J. Reagan, Gabriele M. Lashly; Law Offices of Marc Coleman and Marc Coleman for Defendant and Respondent Cris Sogliuzzo.

## INTRODUCTION

Appellants ask us to reverse the trial court's order granting two special motions to strike their civil complaint as a strategic lawsuit against public participation under the anti-SLAPP statute, Code of Civil Procedure section 425.16. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    *The Parties*

Plaintiff and appellant Centerline Logistics Corporation (Centerline) is the corporate parent of approximately 15 subsidiaries, including plaintiff Westoil Marine Services, Inc. (Westoil). Both are "maritime petroleum companies"—Centerline provides fueling to ships and transports petroleum between critical refineries and terminals "up and down the U.S. West, East, and Gulf Coasts," while Westoil provides "bunkering services in the Los Angeles/Long Beach harbor." Westoil is located at and operates out of Berth 301 in the Port of Los Angeles (the Port).

Defendant and respondent Inlandboatmen's Union of the Pacific (IBU) is a labor organization that represents over 2000 maritime employees along the West Coast.

Defendant and respondent Cris Sogliuzzo (Sogliuzzo) is an employee of Westoil. He is represented by the IBU in his capacity as a maritime worker. He is a member of and shop steward[1] for the IBU.

---

[1]    Shop stewards are members not employed by the IBU who are selected by their peers as liaisons between the union and the workers. They keep the IBU informed about members' working

We collectively refer to Westoil and Centerline as plaintiffs and to the IBU and Sogliuzzo as defendants.

II. *Civil Complaint*

On December 6, 2021, plaintiffs filed a complaint against defendants asserting four causes of action: 1) trade libel; 2) defamation; 3) tortious interference with contractual relations; and 4) tortious interference with economic relations. The complaint alleged:

Plaintiffs "have been operating in the Port . . . for over three decades." Their "reputation in the industry is worth hundreds of millions of dollars in current and expected future revenue." Failure to act safely in the maritime petroleum industry "causes potential harm to people and the environment, and can ruin a company," which is why safety is a "primary concern" for plaintiffs. Claims that plaintiffs "engaged in unlawful practices" and "safety violations, damages [their] reputation and causes significant financial harm."

On October 21, 2021, the Port's Board of Harbor Commissioners (Board) held a special meeting open to the public and broadcast over the internet. The subject of the board meeting was plaintiffs' permit renewal with the Port. Sogliuzzo introduced himself during the meeting as a Westoil employee and IBU member, and proceeded to "spread false, malicious, and defamatory information" about plaintiffs without "any evidence." Sogliuzzo's statements "were made on his own behalf and on behalf of the IBU." He claimed the IBU "objected" to plaintiffs'

---

conditions and may handle the lowest level of informal grievance resolutions. The IBU had 165 shop stewards.

3

requested permit extension with the Port and made "numerous false and inflammatory statements" including:

- " 'We' believe there are [California Division of Occupational Safety and Health (CalOSHA)] violations as it relates to employee health monitoring and site safety."
- " 'We' question if this company . . . has been entirely honest with [the Board] with the name changes and shell games . . . over the last year."
- " 'We' question whether [the Board has] received the proper notification, fees and tariffs owed."
- Centerline demonstrated it will "continue to be a bad actor and should be considered not in good standing" with the Port or the IBU.
- " 'We' believe that Centerline has not been honest about its business practices with the Port or the [National Labor Relations Board (NLRB)]."
- " 'We' believe" the arguments Centerline made with the NLRB "are the opposite that [it] is now making before [the Port], including ownership titles and operative titles."
- " 'We' believe that the insurance coverages are not adequate for the business operations that Centerline conducts."

Immediately following these statements, the Board Commissioner stated that "the Permit the IBU was objecting to was the subject of a 'closed session,' and therefore, it was 'not appropriate to engage in conversation about it.' " President and Chief Executive Officer of Centerline Matt Godden (Godden) was present and "respond[ed] to Sogliuzzo's . . . verbal attack" and

4

qualified the statements as "dishonest and false." Based on "information and belief," Sogliuzzo "previously made similar . . . statements to employees, agents and commissioners of the Port before the October 21, 2021 [meeting]," on his own behalf and on the IBU's behalf.

On November 8, 2021, Centerline executives held a 90-minute-long videoconference meeting with Sogliuzzo. He "refused to confirm he was representing the IBU when he presented his comments on October 21, 2021." He was "evasive" and "unresponsive" when asked what specific instances he thought were concerning and "failed to provide any documentation or proof that he raised specific safety concerns that were not addressed before his October 21, 2021 statements."[2]

Sogliuzzo expressed concern about Benzene gas levels at allegedly hazardous levels to employees, but when pressed for specifics, he "could not provide a specific basis for his belief that Benzene gas was a hazard." Plaintiffs' operations "do not involve . . . Benzene gas" and this is an example of Sogliuzzo's "deliberate falsifications made with actual malice."

Sogliuzzo "admitted he did not know any details concerning" plaintiffs' insurance coverage "despite publicly claiming [plaintiffs] do not have sufficient insurance coverage." Westoil, assisted by Centerline, investigated whether there were, in fact, safety issues to correct. "There [were] no CalOSHA

---

[2] After completing his safety training with Westoil, Sogliuzzo acknowledged "he was responsible for reporting and . . . correcting any unsafe actions or conditions," as appellants "encourage their employees to . . . report any safety or environmental concerns."

violations." Sogliuzzo "lied to the [Board] to harm" plaintiffs.

In 2021, the IBU, through its members and agents, distributed several "false and malicious" written handbills, claiming that "Westoil employees had their work stolen from them" and that plaintiffs "were trying to avoid pension obligations." To date, neither the IBU nor Sogliuzzo "retracted or corrected the statements made during the public October 21, 2021 meeting or . . . before."

After "distribution of the IBU's written material and Sogliuzzo's . . . October 21, 2021 statements," plaintiffs' permit with the Port was "not extended." Plaintiffs believe the handbills and Sogliuzzo's statements "played a material and substantial part in inducing [the Port] to not extend [their] permit." This caused plaintiffs "loss of prospective contracts with [their] current and prospective customers." Sogliuzzo's statements "were intended to disrupt" plaintiffs' performance of their contractual obligations and made it "more expensive and difficult."

Sogliuzzo and the IBU, through its agents, made "untrue statements that disparaged [plaintiffs'] trade and business" with "malice and a reckless disregard for the truth." Defendants "knew or should have known," these statements would harm plaintiffs' reputation and business. Plaintiffs requested damages, fees, and costs.

III. *The IBU's Special Motion to Strike the Complaint*

On February 7, 2022, the IBU filed a special motion to strike the complaint as a strategic lawsuit against public participation under the anti-SLAPP statute, Code of Civil

6

Procedure[3] section 425.16.  The IBU argued Sogliuzzo's October 21, 2021 statements are "protected speech and petitioning activity because he made them to an executive agency during open, public proceedings to consider the companies' port permit renewal—an issue that bears on the public interest in safe, responsible ports."  The IBU further argued Sogliuzzo's statements were protected as privileged by Civil Code section 47, subdivision (b).  In support, the IBU submitted the declarations of IBU President Jay Ubelhart (Ubelhart) and Southern California Regional Director John Skow (Skow).

"IBU did not authorize Sogliuzzo's statements and is not liable for speech he ma[de] as an individual member."  Sogliuzzo is an "IBU member" and "a shop steward"; he is "not an officer or employee of IBU."  As a shop steward, Sogliuzzo "was an agent of IBU only insofar as he had authority to resolve informal grievances at his workplace."  The only individuals authorized to speak on the IBU's behalf were its president and its regional directors; any other speech on the IBU's behalf "must be approved" by either the president or a regional director.  Ubelhart and Skow both reiterated to Sogliuzzo, via email, that he could not speak on behalf of the IBU, but "is able to speak on his own behalf or to identify himself as an IBU member"; a copy of the email to Sogliuzzo was attached as an exhibit.  Ubelhart called Centerline's CEO Godden after the Board meeting "to clarify that Sogliuzzo's statements were not endorsed by the IBU, but Godden never returned his call."

---

[3]    Undesignated statutory references are to the Code of Civil Procedure.

7

The IBU next argued that record evidence supports the statements made by Sogliuzzo. The "gist of Sogliuzzo's statements were true" and were not made with "any knowledge or recklessness by IBU as to their falsity." For instance, Centerline "had taken work historically performed by IBU members for [Westoil] and diverted the work to another subsidiary, Leo Marine" with contracts that "offered lower wages than the IBU contract secured" without first bargaining with the IBU in good faith pursuant to the collective bargaining agreement[4] they are parties to. An "outcome of eliminating IBU-represented jobs [is a] decrease [in] an employer's IBU pension obligations." The IBU "filed multiple unfair labor practices charges" against appellants which are being investigated by the NLRB, and Sogliuzzo's allegations of " 'name changes and shell games' reflect a lay understanding of [the NLRB] charges."

The IBU argued the 2021 handbills are protected by section 425.16, subdivision (e)(2) and (3), and privileged under Civil Code section 47, subdivision (b). While the IBU did create and distribute handbills in 2021, they "do not contain the statements alleged in the Complaint." The IBU "planned a handbilling action" for May 6, 2021 relating to the "issues raised in [the IBU's] NLRB complaints." The handbills, attached as exhibits, were "hand[ed] out" at a public rally. Skow approved each

---

[4]    The IBU and Westoil are parties to a collective bargaining agreement effective July 30, 2018 through November 30, 2022. Millennium Maritime (Millennium), another subsidiary of Centerline, is also a party to this agreement. Per Skow, Centerline sold Millenium in December 2020 and now operates Millennium's former asset under the name Westoil Tug Services.

8

handbill as part of his duties as regional director. None of the handbills approved by Skow stated Centerline or Westoil "stole" work or sought to avoid its pension obligations. Sogliuzzo sent Skow an email on May 7, 2021 with a handbill attached that Skow "had never seen before" and never approved. "It did not occur to [Skow] that Sogliuzzo would have handed out an unapproved handbill."

The IBU also argued plaintiffs suffered no damages and continue to operate out of the Port past the alleged permit expiration. The minutes from the October 21, 2021 special meeting, attached as an exhibit, states the Board "considered" item No. 7 of their special meeting agenda (regarding Millennium's use of Berth 301 and Permit No. 882) and "took no reportable action." None of the agendas for the Board meetings held after October 21, 2021, attached as exhibits, mention Permit No. 882. Plus, the resolution issued on October 22, 2014 by the Board, attached as an exhibit, shows Permit No. 882 was granted for use of Berth 301, effective November 1, 2011, for a "five-year term, with two five-year options" to extend.

## IV. *Sogliuzzo's Special Motion to Strike the Complaint*

On March 8, 2022, Sogliuzzo filed a special motion to strike the complaint, repeating the arguments made by the IBU. In support he submitted his declaration.

Sogliuzzo stated he learned in 2021 that Centerline took "work historically performed by IBU members for Centerline's subsidiary Westoil, and diverted the work to another subsidiary, Leo Marine" without an election. Sogliuzzo's "statement of 'name changes and shell games' reflects [his] understanding of those charges" and his "notion that Centerline has not acted as a good contractual partner to the IBU was inferred fairly from the fact

9

that IBU was forced to file unfair labor practice charges against the company." Multiple subsidiaries "are operating out of the same berth and swapping work between them" which raised questions about insurance coverage, fees, and tariffs.

## V. *Opposition to Special Motions to Strike*

On May 27, 2022, plaintiffs filed their opposition to the special motions to strike and submitted supporting declarations and exhibits.

The declaration of John Saltsman (Saltsman), the vice president of finance for plaintiffs, provides: his duties include "negotiating for Permit No. 882" on behalf of Millennium with the Port. Portions of the permit were included as an exhibit. According to Saltsman, the permit states the Port's right to exercise the option for five-year extension is " 'conditioned upon Tenant not being in default under this Agreement at the time of exercising the Option to Extend' " and remain in compliance with "all applicable legal requirements." Saltsman "had every expectation that the Second Extension Term would be approved as a matter of course" because "Westoil and Centerline had <u>not</u> been in default, and had been in compliance . . . with all applicable legal requirements." The Port "abruptly changed course" after Sogliuzzo's statement and "did not approve the Second Extension Term at the Special Board Meeting." Westoil "was forced to submit a written request to the Port to retain the Premises in 'holdover' status" which the Port approved; as a result, the Port charged Westoil "holdover rent at 150% of the base rent amount," resulting in $90,108.20 in additional amounts incurred by appellants.

The declaration of Bryon Fletcher (Fletcher), the vice president of Health, Safety, & Environmental for Centerline,

provided that after Sogliuzzo's October 21, 2021 statement that Centerline companies had violated CalOSHA requirements, he investigated the allegations and interviewed Sogliuzzo on November 8, 2021. During the investigation, Fletcher found Sogliuzzo "evasive" and "failed to provide . . . any details, documentation, or other proof" that would substantiate his claims of CalOSHA violations. Sogliuzzo mentioned "a safety issue related to a forklift" but did not provide additional details. He also identified CalOSHA violations regarding health monitoring as it relates to "hearing testing and Benzene testing" but "did not elaborate." Fletcher determined Sogliuzzo's allegations at the October 21, 2021 meeting were "false and unsubstantiated."

VI.    *Sogliuzzo's Statement*

A transcript of Sogliuzzo's October 21, 2021 statement was included as an exhibit. We recite portions of it here:

"My name is Cris Sogliuzzo. I am an employee of Westoil Marine Services, part of Centerline Logistics, and a member of the [IBU] . . . . Some other names Centerline operates, or has operated as, [Millennium] Maritime, Olympic Tug and Barge, [Leo] Marine Services; Westoil Marine Services, Westoil Tug Services, Starlight Marine Services, and [Harley] Marine Services. Centerline's [Permit No.] 882 is on the closed session agenda on October 21st as item number seven. . . . The IBU objects to this extension. We [want to] make you aware that there are 10 pending [NLRB] cases against this company, and an hours and wages class action lawsuit that is a couple years running now." He believes there are CalOSHA "violations as it relates to employee health monitoring and site safety. We question if this company has been entirely honest with you, as to the name changes and shell games that have taken place over the

11

last year." He requested the Board to "hold off on finalizing any agreements so that . . . you may conduct an investigation yourselves and until the pending NLRB violations are decided." He then listed the NLRB case numbers and contact information for the attorney who sued Centerline for unpaid wages.

VII. ***Replies in Support of Motions to Strike***

On May 26, 2022, the IBU filed a response to Sogliuzzo's special motion to strike. On June 2, 2022, the IBU and Sogliuzzo each filed a reply in support of their anti-SLAPP motions.

The IBU argued that the "NLRB's recent actions provide additional support and context for [Sogliuzzo's] comments" and provided, as exhibits, decisions made by the NLRB on March 11 and 17, 2022, including the following. "[T]here are no bars to the processing of the petitions and that Centerline, [Olympic Tug & Barge], and Leo Marine are a single employer." "Centerline, Olympic Tug & Barge, and Leo Marine have been discriminating in regard to the hire or tenure or terms or conditions of employment of their employees, thereby encouraging membership in a labor organization in violation of Sections 8(a)(1) and (3)" of the National Labor Relations Act (the Act) (29 U.S.C. § 151 et seq.). "Westoil has been failing and refusing to bargain collectively and in good faith with the exclusive collective-bargaining representative of its employees in violation of Section 8(a)(1) and (5) of the Act." The IBU contends the May 2021 handbills are true and fairly characterize the pending NLRB charges. Additionally, "peacefully circulating handbills to advertise a labor dispute, without any pressure on secondary employers, is activity clearly protected by federal labor law and the First Amendment."

Finally, as to plaintiffs' request for damages based on their holdover costs, the "Sogliuzzo's comments did not cause [p]laintiffs' holdover costs. . . . If the Port had considered [p]laintiffs in default of the Permit condition that they comply with the law, the Port would have been required to provide [them] written notice of the allegation and a 90-day opportunity to cure. . . . But the Port has not issued any such default notice."

## VIII. *Trial Court's Ruling*

We were not provided a reporter's transcript of the June 10, 2022 hearing on the motions. The minute order provides that the court "hear[d] oral argument." The court granted both special motions to strike and found the prevailing parties entitled to attorney fees.

On July 1, 2022, the trial court entered judgment striking plaintiffs' complaint in its entirety and dismissing all claims with prejudice.

## IX. *Motions for Attorney Fees*

On July 15, 2022, the IBU and Sogliuzzo each filed a motion for attorney fees. The IBU sought $73,258.75 in fees. Sogliuzzo sought $30,892 in fees. Plaintiffs opposed the motions.

On September 20, 2022, the trial court heard the IBU's motion and awarded $33,200 in fees against plaintiffs jointly and severally. It also granted Sogliuzzo's motion and awarded $30,952 in fees. The court amended the July 1, 2022 judgment by interlineation to reflect the fee awards.

Centerline and Westoil timely appealed.

13

## DISCUSSION[5]

### I.     *Standard of Review*

We review a trial court's ruling on a special motion to strike pursuant to section 425.16 under the de novo standard. (*Li v. Jenkins* (2023) 95 Cal.App.5th 493, 499; *Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788; *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1067 (*Park*).)  "In other words, we employ the same two-pronged procedure as the trial court in determining whether the anti-SLAPP motion was properly granted." (*Mendoza v. ADP Screening & Selection Services, Inc.* (2010) 182 Cal.App.4th 1644, 1652.)

In making our determination, we consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.  (§ 425.16, subd. (b)(2).)  In considering the pleadings and declarations, we do not make credibility determinations or compare the weight of the evidence; instead, we accept the opposing party's evidence as true and evaluate the moving party's evidence only to determine if it has defeated the opposing party's evidence as a matter of law. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.)

---

[5]     We deny plaintiffs' request for judicial notice filed March 6, 2024; it is not relevant to the issues on appeal.  (*Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063 [disapproved on other grounds by *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1276]; see also *American Cemwood Corp. v. American Home Assurance Co.* (2001) 87 Cal.App.4th 431, 441, fn. 7.)

14

## II.    *The Anti-SLAPP Statute*

Section 425.16 provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech . . . in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)  An " 'act in furtherance of a person's right of petition or free speech . . . in connection with a public issue' " is defined in section 425.16 to include: (1) "any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law"; (2) "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law"; 3) "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest"; or 4) "any other conduct in furtherance of the exercise of the constitutional right of petition or . . . free speech in connection with a public issue or an issue of public interest." (*Id.*, subd. (e).)

The Legislature enacted section 425.16 to prevent and deter "lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (§ 425.16, subd. (a).)  The purpose of the anti-SLAPP law is "not [to] insulate defendants from *any* liability for claims arising from the protected rights of petition or speech. It only provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).)  To accomplish this

purpose, the Legislature expressly specifies that the statute "be construed broadly."  (§ 425.16, subd. (a).)

When a party moves to strike a cause of action under the anti-SLAPP law, a trial court evaluates the special motion to strike using a two-prong test: (1) has the moving party "made a threshold showing that the challenged cause of action arises from protected activity" (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056 (*Rusheen*)); and, if it has, (2) has the non-moving party demonstrated that the challenged cause of action has "minimal merit" by making "a prima facie factual showing sufficient to sustain" a judgment in its favor.  (*Baral*, *supra*, 1 Cal.5th at pp. 384–385; see *Navellier v. Sletten* (2002) 29 Cal.4th 82, 93–94; see also § 425.16, subd. (b)(1)).  After the first prong is satisfied by the moving party, "the burden [then] shifts to the [non-moving party] to demonstrate that each challenged claim based on protected activity is legally sufficient and factually substantiated."  (*Baral*, at p. 396.)

### III.    *Absence of a Reporter's Transcript*

The record on appeal does not include a settled statement or agreed statement as authorized by California Rules of Court, rules 8.163 and 8.137.  The June 10, 2022 minute order specifies that the court "hear[d] oral argument" on the anti-SLAPP motions before it made its ruling.

Affirmance of the order appealed from may be warranted in the absence of a reporter's transcript when such a transcript is necessary for meaningful review.  (See, e.g., *Foust v. San Jose Construction Co., Inc.* (2011) 198 Cal.App.4th 181, 186–187 [appeal requiring consideration of testimony could not proceed in the absence of a reporter's transcript or a settled statement].)  However, because we review an order granting an anti-SLAPP

16

motion de novo and must conduct an independent analysis of our own, we can resolve the appeal in the absence of a reporter's transcript. "While a record of the hearing would have been helpful to understand the trial court's reasoning, it is not necessary here where our review is de novo and the appellate record includes the trial court's written orders and all . . . materials germane to appellants' motion." (*Bel Air Internet, LLC v. Morales* (2018) 20 Cal.App.5th 924, 933; *Chodos v. Cole* (2012) 210 Cal.App.4th 692, 696.)

## IV.     *Prong 1*: *The Claims Arise from Protected Activity*

Plaintiffs argue the claims in their complaint do not arise from protected speech or activity.

Step one of the anti-SLAPP analysis requires us to decide whether the moving parties—here, the IBU and Sogliuzzo—have shown the claims in the complaint arise from protected speech or petitioning activity.  (§ 425.16, subd. (b)(1); *Castleman v. Sagaser* (2013) 216 Cal.App.4th 481, 490.)  "A claim arises from protected activity when that activity underlies or forms the basis for the claim." (*Park*, *supra*, 2 Cal.5th at p. 1062.)  We review the parties' pleadings, declarations, and other supporting documents at this stage of the analysis "only 'to determine what conduct is actually being challenged, not to determine whether the conduct is actionable.' " (*Castleman*, at p. 491.)

It is evident on the face of the complaint that plaintiffs' claims are entirely premised on two incidents of conduct and/or speech: (1) the statement made by Sogliuzzo at the Board meeting held October 21, 2021, and (2) the May 2021 handbills.

Plaintiffs argue on appeal that the complaint is based on *three* incidents: the May 2021 handbills and statements made by Sogliuzzo "on two separate occasions"—first, "in a private

17

meeting" on October 7, 2021 with "an IBU official, Michael Vera" and "Michael DiBernardo, the Deputy Executive Director for the Port"; and second, on October 21, 2021 at the Board meeting. Plaintiffs cite to paragraphs 18–24 of the complaint as support, but those paragraphs only discuss the October 21, 2021 incident. Paragraph 24 alleges based on "information and belief" that Sogliuzzo "previously made similar . . . statements to employees, agents and commissioners of the Port before the October 21, 2021 [meeting]." Nowhere in the entire complaint is the October 7, 2021 date mentioned, the name Michael Vera mentioned, nor is there any private meeting with the IBU and Port deputy referenced. Plaintiffs' pleaded claims in the complaint arise entirely from the May 2021 handbilling and the October 21, 2021 statements; it makes no claim based on any October 7, 2021 private meeting. Plaintiffs' attempt to rewrite the complaint on appeal is not well taken.

A.    Sogliuzzo's October 21, 2021 Statements

The complaint alleged that Sogliuzzo's statements were made at a special meeting held by Board on October 21, 2021 "open to the public and broadcast . . . over the internet." The complaint further alleged the "subject" of the meeting was for appellants' "permit renewal" with the Port.

Section 425.16, subdivision (e)(1) protects "any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or *any other official proceeding authorized by law*." (§ 425.16, subd. (e)(1), italics added.) The California Supreme Court has concluded that this phrase applies to proceedings required by statute. (See *Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 199–200.) Here, a meeting held by the Board for purpose of negotiating

18

lease of property (here, Berth 301) is an official proceeding authorized by statute.  (See Harb. & Nav. Code, § 6063 [The Board "shall hold at least one meeting a month . . . within the district and shall be open to the public."]; see Gov. Code, § 54956.8 [a "legislative body of a local agency shall hold an open and public session" where negotiation or discussion is held regarding the lease of real property and the price and terms of payment for the lease]; see also *Midland Pacific Building Corp. v. King* (2007) 157 Cal.App.4th 264, 273–274 [statements made to planning commission and city council in connection with application for a development permit are protected activity]; see also *City of Montebello v. Vasquez* (2016) 1 Cal.5th 409, 413–415, 425–427 [Following a vote by the Montebello City Council in favor of entering a municipal waste disposal contract with a private party, it came to light that some city council members had conflicts of interest due to financial contributions to their campaigns; regardless, the council members' votes and the statements made in the course of their deliberations at the city council meeting, are protected.].)  In fact, the Board's October 21, 2021 special meeting's agenda, provided as an exhibit in support of Sogliuzzo's motion to strike, states the Board meeting's purpose was to hold a "[c]onference with real property negotiators" and expressly refers to Government Code section 54956.8.

Oddly, plaintiffs do not address section 425.16, subdivision (e)(1), nor dispute its application.  Instead, they argue Sogliuzzo's statements are not protected because they addressed an issue not under review by the Board.  Section 425.16, subdivision (e)(1) does not, however, include any requirement that Sogliuzzo's statements concern "an issue under consideration or review"—

19

that is only required by subdivision (e)(2). (§ 425.16, subd. (e)(1), (2).)

Further, we find Sogliuzzo's statements are protected under section 425.16, subdivision (e)(2) as well. Sogliuzzo's statements at the Board meeting discussed various issues pertaining to Centerline and its subsidiaries, including Westoil and Millennium, and raised those issued in connection with the Board's consideration of item No. 7 on their meeting agenda, i.e., Permit No. 882 and plaintiffs' use of Berth 301. Sogliuzzo raised issues regarding plaintiffs' operations that he believed the Board should be aware of when considering plaintiffs' extension of the lease of Berth 301. This is further supported by evidence supplied by plaintiffs in the declaration of plaintiffs' vice president of finance, Saltsman, submitted in support of plaintiffs' opposition to the special motions to strike. According to Saltsman, the permit states the Port's right to exercise the option for five-year extension is " 'conditioned upon Tenant not being in default under this Agreement at the time of exercising the Option to Extend' " and remain in compliance with "all applicable legal requirements." Thus, Sogliuzzo's statement was made in the Board's official meeting in connection with an issue under consideration by the Board, i.e., negotiations regarding Permit No. 882, and lease terms with Centerline and its subsidiaries.

We are perplexed by plaintiffs' argument on appeal that Sogliuzzo's statements constituted "commercial speech" and were not related to an issue under review. Plaintiffs contend the "meeting here involved the [Board's] determination of Berth [301's] *rate*, which Westoil had been leasing." (Italics added.) They argue the "only issue before the [Board] involved *the rate prices* for the permit." (Italics added.) Plaintiffs' argument is

contradicted by their own pleadings, namely their complaint. The complaint specifies the purpose of the October 21, 2021 meeting was to consider their request for a "permit renewal." Plaintiffs did not allege in the complaint that the Board meeting was limited to determining only lease rates. In fact, the transcript of Sogliuzzo's October 21, 2021 statement, included as an exhibit to plaintiffs' opposition to the motions to strike, provides that Sogliuzzo requested the Board to "hold off on finalizing any agreements so that . . . you may conduct an investigation yourselves and until the pending NLRB violations are decided" in connection to "Centerline's permit number 882 is on the closed session agenda on October 21st as item number seven."

Defendants further argue Sogliuzzo's statement is also protected by section 425.16, subdivisions (e)(3) and (e)(4). As we have already found two separate grounds protecting Sogliuzzo's October 21, 2021 statement, we need not and do not address additional grounds.

B. <u>May 2021 Handbills</u>

Plaintiffs contend the written pamphlets distributed by the IBU are not protected. They argue that the IBU "cannot prove that their . . . 2021 handbills falsely accusing [appellants] of 'stealing our work' for 'sham union' were in any way a matter under review by the Board." They argue the handbills "contain false statements made with actual malice."

We disagree and find the handbills are protected under section 425.16, subdivision (e)(2). To be deemed protected under subdivision (e)(2), the writing must be "made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by

21

law." (§ 425.16, subd. (e)(2).)  The handbills distributed at the rally were related to the "issues raised in the NLRB complaints." The NLRB is a federal agency that enforces U.S. labor law in relation to collective bargaining and unfair labor practices.  The IBU had filed "multiple unfair labor practices charges" against plaintiffs based on allegations that Centerline "had taken work historically performed by IBU members for [Westoil] and diverted the work to another subsidiary, Leo Marine" with contracts that "offered lower wages than the IBU contract secured" without first bargaining with the IBU in good faith pursuant to their collective bargaining agreement.

We have reviewed the handbills, included as an exhibit to Skow's declaration, and they do not contain the statements alleged in the complaint.  The handbills bring attention to "the much-publicized asset exchange" with Leo Marine and that it "circumvent[ed] local union contracts and cripple[d] area workers."  The handbills state that the "creation of new tug and barge companies in an already highly competitive market . . . shift[s] work away from strong IBU companies" and referred to the creation of new "sham" companies.  In fact, the NLRB recently determined that "Centerline, [Olympic Tug & Barge], and Leo Marine are a single employer" and that there have been violations of Sections 8(a)(1), (3), and (5) of the Act.  The content of the handbills discusses the issues that were pending NLRB charges, rendering them protected under section 425.16, subdivision (e)(2).

Finally, plaintiffs' assertions of malice are not properly addressed as part of our prong one analysis and fall under prong two.  "At the first prong, courts consider whether a defendant has made a prima facie showing that activity underlying a plaintiff's

22

causes of action is statutorily protected, 'not whether it has shown its acts are ultimately lawful.' " (*RGC Gaslamp, LLC v. Ehmcke Sheet Metal Co., Inc.* (2020) 56 Cal.App.5th 413, 425–426; see also *Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 910–911, italics omitted ["[C]onduct that would otherwise come within the scope of the anti-SLAPP statute does not lose its coverage . . . simply because it is alleged to have been unlawful or unethical. If that were the test, the statute (and the privilege) would be meaningless."].)

Based on the foregoing, plaintiffs' claims arise from protected speech and conduct.

## V. *Prong 2: Probability of Prevailing on the Claims*

We proceed to prong two of the anti-SLAPP analysis—and the burden shifts to plaintiffs to establish probability of prevailing on the causes of action of their complaint.

The principal difficulty plaintiffs face in showing a probability of prevailing on their claims as to Sogliuzzo's statements is California's litigation privilege codified in Civil Code section 47, subdivision (b), which provides an absolute privilege for communications made in any legislative, judicial or other official proceeding authorized by law, or in the initiation or course of any other proceeding authorized by law. (Civ. Code § 47, subd. (b).) The litigation privilege is "relevant to the second step in the anti-SLAPP analysis in that it may present a substantive defense a plaintiff must overcome to demonstrate a probability of prevailing." (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 323 (*Flatley*).) Regardless of whether plaintiffs have generally averred the elements of the four causes of action in the complaint, they cannot rebut defendants' litigation privilege defense.

23

The principal purpose of the litigation privilege is to afford litigants and witnesses the utmost freedom of access to the courts without fear of harassment in subsequent derivative actions. (*People ex rel. Gallegos v. Pacific Lumber Co.* (2008) 158 Cal.App.4th 950, 958 (*Gallegos*).)  "The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action."  (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 212.)  The litigation privilege is "not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards."  (*Rusheen, supra*, 37 Cal.4th at p. 1057.)  The privilege extends beyond statements made in the proceedings, and includes statements made to initiate official action.  (*Wise v. Thrifty Payless, Inc.* (2000) 83 Cal.App.4th 1296, 1303 (*Wise*).)

Sogliuzzo's statements were made at a meeting held by the Port of Los Angeles's Board of Harbor Commissioners for purpose of negotiating lease terms of Berth 301; that is an official proceeding authorized by statute (see Harb. & Nav. Code, § 6063; see Gov. Code, § 54956.8) and thus qualifies it as "other official proceeding authorized by law" pursuant to Civil Code section 47, subdivision (b).

Further, Sogliuzzo's comments in response to agenda item No. 7 on the Board's agenda, i.e., lease of Berth 301 and Permit No. 882, raised various labor and business disputes and issues with Centerline and its subsidiaries—including the "10 pending [NLRB] cases against this company, and an hours and wages class action lawsuit that is a couple years running now"—and

requested the Board to "conduct an investigation . . . until the pending NLRB violations are decided" prior to "finalizing any agreements" and making any decision regarding Permit No. 882. His statement to the Board complaining about the ongoing labor practice issues with plaintiffs and its possible impact on the Board's decision squarely falls within the privilege for quasi-judicial proceedings. "The litigation privilege is not limited to the courtroom, but encompasses actions by administrative bodies and quasi-judicial proceedings." (*Wise, supra*, 83 Cal.App.4th at p. 1303.) "An absolute privilege exists to protect citizens from the threat of litigation for communications to government agencies whose function it is to investigate and remedy wrongdoing." (*Ibid*.) The privilege is based on the importance of providing to citizens free and open access to governmental agencies for the reporting of suspected illegal activity. (*Ibid*.)

As for the handbills, plaintiffs argue the pamphlets are not protected under Civil Code section 47 because they were made with malice. Appellants are mistaken. The privilege is an absolute privilege and bars all tort causes of action except a claim of malicious prosecution. (*Flatley, supra*, 39 Cal.4th at p. 322.) The litigation privilege protects even communication made with an intent to harm, so long as the communication is made in "relation" to a pending/ongoing or genuinely contemplated judicial or other official proceeding. (*Gallegos, supra,* 158 Cal.App.4th at pp. 958–959; Civ. Code, § 47, subd. (b); *Wise, supra,* 83 Cal.App.4th at p. 1302 [the litigation privilege applies "regardless of the existence of malice or intent to harm"].)

Moreover, plaintiffs' claims fail given the absence of damages pleaded. The complaint fails to allege any relationship or cause and effect between the IBU's May 2021 handbills and

25

any resulting damages, other than a generalized statement that following the "distribution of the IBU's written material," plaintiffs' permit with the Port was "not extended." The pleadings, declarations, and evidence do not support that allegation. The minutes from the October 21, 2021 special meeting, attached as an exhibit, states the Board "considered" item No. 7 of their special meeting agenda (regarding Millennium's use of Berth 301 and Permit No. 882) and "took *no* reportable action." None of the agendas for the Board meetings held after October 21, 2021, attached as exhibits, mention Permit 882 or any possible extension. Plaintiffs refer to holdover costs they have incurred as proof that the Port did not extend their lease as a result of the handbills, but this is a stretch given the allegations in the complaint. There is no pleaded relationship between the handbills and the Port's actions regarding Permit No. 882 on October 21, 2021.

The claims alleged in the complaint are barred by defendants' litigation privilege defense.

VI. ***Attorney Fees***

Lastly, plaintiffs' sole basis for challenging the award of attorney fees to defendants under section 425.16, subdivision (c) is that the trial court erred in granting the anti-SLAPP motions. Because we affirm the order granting the anti-SLAPP motions, we also affirm the award of attorney fees.

26

## DISPOSITION

The trial court's orders and judgment are affirmed. Defendants shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1).)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


STRATTON, P. J.

We concur:


GRIMES, J.


WILEY, J.